Chief Justice Roberts
announced the judgment of the Court, and delivered the opinion of the Court with respect to Parts I, II, III-A, and III — C, and an opinion with respect *709 to Parts III-B and IV, in which Justice Scalia, Justice Thomas, and Justice Alito join.
The school districts in these cases voluntarily adopted student assignment plans that rely upon race to determine *710 which public schools certain children may attend. The Seattle school district classifies children as white or nonwhite; the Jefferson County school district as black or “other.” In Seattle, this racial classification is used to allocate slots in oversubscribed high schools. In Jefferson County, it is used to make certain elementary school assignments and to rule on transfer requests. In each case, the school district relies upon an individual student’s race in assigning that student to a particular school, so that the racial balance at the school falls within a predetermined range based on the racial composition of the school district as a whole. Parents of students denied assignment to particular schools under these *711 plans solely because of their race brought suit, contending that allocating children to different public schools on the basis of race violated the Fourteenth Amendment guarantee of equal protection. The Courts of Appeals below upheld the plans. We granted certiorari, and now reverse.
I
Both cases present the same underlying legal question— whether a public school that had not operated legally segregated schools or has been found to be unitary may choose to classify students by race and rely upon that classification in making school assignments. Although we examine the plans under the same legal framework, the specifics of the two plans, and the circumstances surrounding their adoption, are in some respects quite different.
A
Seattle School District No. 1 operates 10 regular public high schools. In 1998, it adopted the plan at issue in this case for assigning students to these schools. App. in No. 05-908, pp. 90a-92a,[1] The plan allows incoming ninth graders to choose from among any of the district’s high schools, ranking however many schools they wish in order of preference.
Some schools are more popular than others. If too many students list the same school as their first choice, the district employs a series of “tiebreakers” to determine who will fill the open slots at the oversubscribed school. The first tiebreaker selects for admission students who have a sibling *712 currently enrolled in the chosen school. The next tiebreaker depends upon the racial composition of the particular school and the race of the individual student. In the district’s public schools approximately 41 percent of enrolled students are white; the remaining 59 percent, comprising all other racial groups, are classified by Seattle for assignment purposes as nonwhite. Id., at 38a, 103a.[2] If an oversubscribed school is not within 10 percentage points of the district’s overall white/nonwhite racial balance, it is what the district calls “integration positive,” and the district employs a tiebreaker that selects for assignment students whose race “will serve to bring the school into balance.” Id., at 38a. See Parents Involved VII, 426 F. 3d 1162, 1169-1170 (CA9 2005) (en banc).[3] If it is still necessary to select students for the school after using the racial tiebreaker, the next tiebreaker is the geographic proximity of the school to the student’s residence. App. in No. 05-908, at 38a.
Seattle has never operated segregated schools — legally separate schools for students of different races — nor has it ever been subject to court-ordered desegregation. It nonetheless employs the racial tiebreaker in an attempt to address the effects of racially identifiable housing patterns on school assignments. Most white students live in the northern part of Seattle, most students of other racial backgrounds in the southern part. Parents Involved VII, supra, at 1166. Four of Seattle’s high schools are located in the north — Ballard, Nathan Hale, Ingraham, and Roosevelt— and five in the south — Rainier Beach, Cleveland, West Seat- *713 tie, Chief Sealth, and Franklin. One school — Garfield—is more or less in the center of Seattle. App. in No. 05-908, at 38a-39a, 45a.
For the 2000-2001 school year, five of these schools were oversubscribed — Ballard, Nathan Hale, Roosevelt, Garfield, and Franklin — so much so that 82 percent of incoming ninth graders ranked one of these schools as their first choice. Id., at 38a. Three of the oversubscribed schools were “integration positive” because the school’s white enrollment the previous school year was greater than 51 percent — Ballard, Nathan Hale, and Roosevelt. Thus, more nonwhite students (107,27, and 82, respectively) who selected one of these three schools as a top choice received placement at the school than would have been the case had race not been considered, and proximity been the next tiebreaker. Id., at 39a-40a. Franklin was “integration positive” because its nonwhite enrollment the previous school year was greater than 69 percent; 89 more white students were assigned to Franklin by operation of the racial tiebreaker in the 2000-2001 school year than otherwise would have been. Ibid. Garfield was the only oversubscribed school whose composition during the 1999-2000 school year was within the racial guidelines, although in previous years Garfield’s enrollment had been predominantly nonwhite, and the racial tiebreaker had been used to give preference to white students. Id., at 39a.
Petitioner Parents Involved in Community Schools (Parents Involved) is a nonprofit corporation comprising the parents of children who have been or may be denied assignment to their chosen high school in the district because of their race. The concerns of Parents Involved are illustrated by Jill Kurfirst, who sought to enroll her ninth-grade son, Andy Meeks, in Ballard High School’s special Biotechnology Career Academy. Andy suffered from attention deficit hyperactivity disorder and dyslexia, but had made good progress with hands-on instruction, and his mother and middle school teachers thought that the smaller biotechnology program *714 held the most promise for his continued success. Andy was accepted into this selective program but, because of the racial tiebreaker, was denied assignment to Ballard High School. Id., at 143a-146a, 152a-160a. Parents Involved commenced this suit in the Western District of Washington, alleging that Seattle’s use of race in assignments violated the Equal Protection Clause of the Fourteenth Amendment,[4] Title VI of the Civil Rights Act of 1964,[5] and the Washington Civil Rights Act.[6] Id., at 28a-35a.
The District Court granted summary judgment to the school district, finding that state law did not bar the district’s use of the racial tiebreaker and that the plan survived strict scrutiny on the federal constitutional claim because it was narrowly tailored to serve a compelling government interest. 137 F. Supp. 2d 1224, 1240 (WD Wash. 2001) (Parents Involved I). The Ninth Circuit initially reversed based on its interpretation of the Washington Civil Rights Act, 285 F. 3d 1236, 1253 (2002) (.Parents Involved II), and enjoined the district’s use of the integration tiebreaker, id., at 1257. Upon realizing that the litigation would not be resolved in time for assignment decisions for the 2002-2003 school year, the Ninth Circuit withdrew its opinion, 294 F. 3d 1084 (2002) {Parents Involved III), vacated the injunction, and, pursuant to Wash. Rev. Code §2.60.020 (2006), certified the state-law question to the Washington Supreme Court, 294 F. 3d 1085, 1087 (2002) {Parents Involved IV).
*715 The Washington Supreme Court determined that the State Civil Rights Act bars only preferential treatment programs “where race or gender is used by government to select a less qualified applicant over a more qualified applicant,” and not “[programs which are racially neutral, such as the [district’s] open choice plan.” Parents Involved in Community Schools v. Seattle School Dist., No. 1, 149 Wash. 2d 660, 689-690, 663, 72 P. 3d 151, 166, 153 (2003) (en banc) (Parents Involved V). The state court returned the case to the Ninth Circuit for further proceedings. Id., at 690, 72 P. 3d, at 167.
A panel of the Ninth Circuit then again reversed the District Court, this time ruling on the federal constitutional question. Parents Involved VI, 377 F. 3d 949 (2004). The panel determined that while achieving racial diversity and avoiding racial isolation are compelling government interests, id., at 964, Seattle’s use of the racial tiebreaker was not narrowly tailored to achieve these interests, id., at 980. The Ninth Circuit granted rehearing en banc, 395 F. 3d 1168 (2005), and overruled the panel decision, affirming the District Court’s determination that Seattle’s plan was narrowly tailored to serve a compelling government interest, Parents Involved VII, 426 F. 3d, at 1192-1193. We granted certiorari. 547 U. S. 1177 (2006).
B
Jefferson County Public Schools operates the public school system in metropolitan Louisville, Kentucky. In 1973 a federal court found that Jefferson County had maintained a segregated school system, Newburg Area Council, Inc. v. Board of Ed. of Jefferson Cty., 489 F. 2d 925, 932 (CA6), vacated and remanded, 418 U. S. 918, reinstated with modifications, 510 F. 2d 1358, 1359 (CA6 1974), and in 1975 the District Court entered a desegregation decree. See Hampton v. Jefferson Cty. Bd. of Ed., 72 F. Supp. 2d 753, 762-764 (WD Ky. 1999). Jefferson County operated under this decree until 2000, when the District Court dissolved the decree after *716 finding that the district had achieved -unitary status by eliminating “[t]o the greatest extent practicable” the vestiges of its prior policy of segregation. Hampton v. Jefferson Cty. Bd. of Ed., 102 F. Supp. 2d 358, 360 (2000). See Board of Ed. of Oklahoma City Public Schools v. Dowell, 498 U. S. 237, 249-250 (1991); Green v. School Bd. of New Kent Cty., 391 U. S. 430, 435-436 (1968).
In 2001, after the decree had been dissolved, Jefferson County adopted the voluntary student assignment plan at issue in this case. App. in No. 05-915, p. 77. Approximately 34 percent of the district’s 97,000 students are black; most of the remaining 66 percent are white. McFarland v. Jefferson Cty. Public Schools, 330 F. Supp. 2d 834, 839-840, and n. 6 (WD Ky. 2004) (McFarland I). The plan requires all nonmagnet schools to maintain a minimum black enrollment of 15 percent, and a maximum black enrollment of 50 percent. App. in No. 05-915, at 81; McFarland I, supra, at 842.
At the elementary school level, based on his or her address, each student is designated a “resides” school to which students within a specific geographic area are assigned; elementary resides schools are “grouped into clusters in order to facilitate integration.” App. in No. 05-915, at 82. The district assigns students to nonmagnet schools in one of two ways: Parents of kindergartners, first graders, and students new to the district may submit an application indicating a first and second choice among the schools within their cluster; students who do not submit such an application are assigned within the cluster by the district. “Decisions to assign students to schools within each cluster are based on available space within the schools and the racial guidelines in the District’s current student assignment plan.” Id., at 38. If a school has reached the “extremes of the racial guidelines,” a student whose race would contribute to the school’s racial imbalance will not be assigned there. Id., at 38-39, 82. After assignment, students at all grade levels *717 are permitted to apply to transfer between nonmagnet schools in the district. Transfers may be requested for any number of reasons, and may be denied because of lack of available space or on the basis of the racial guidelines. Id., at 43.[7]
When petitioner Crystal Meredith moved into the school district in August 2002, she sought to enroll her son, Joshua McDonald, in kindergarten for the 2002-2003 school year. His resides school was only a mile from his new home, but it had no available space — assignments had been made in May, and the class was full. Jefferson County assigned Joshua to another elementary school in his cluster, Young Elementary. This school was 10 miles from home, and Meredith sought to transfer Joshua to a school in a different cluster, Bloom Elementary, which — like his resides school — was only a mile from home. See Tr. in McFarland I, pp. 1-49 through 1-54 (Dec. 8, 2003). Space was available at Bloom, and intercluster transfers are allowed, but Joshua’s transfer was nonetheless denied because, in the words of Jefferson County, “[t]he transfer would have an adverse effect on desegregation compliance” of Young. App. in No. 05-915, at 97.[8]
Meredith brought suit in the Western District of Kentucky, alleging violations of the Equal Protection Clause of the Fourteenth Amendment. The District Court found that Jefferson County had asserted a compelling interest in main *718 taining racially diverse schools, and that the assignment plan was (in all relevant respects) narrowly tailored to serve that compelling interest. McFarland I, supra, at 837.[9] The Sixth Circuit affirmed in a per curiam opinion relying upon the reasoning of the District Court, concluding that a written opinion “would serve no useful purpose.” McFarland v. Jefferson Cty. Public Schools, 416 F. 3d 513, 514 (2005) (McFarland II). We granted certiorari. 547 U. S. 1178 (2006).
II
As a threshold matter, we must assure ourselves of our jurisdiction. Seattle argues that Parents Involved lacks standing because none of its current members can claim an imminent injury. Even if the district maintains the current plan and reinstitutes the racial tiebreaker, Seattle argues, Parents Involved members will only be affected if their children seek to enroll in a Seattle public high school and choose an oversubscribed school that is integration positive — too speculative a harm to maintain standing. Brief for Respondents in No. 05-908, pp. 16-17.
This argument is unavailing. The group’s members have children in the district’s elementary, middle, and high schools, App. in No. 05-908, at 299a-301a; Affidavit of Kathleen Brose Pursuant to this Court’s Rule 32.3 (Lodging of Petitioner Parents Involved), and the complaint sought declaratory and injunctive relief on behalf of Parents Involved members whose elementary and middle school children may be “denied admission to the high schools of their choice when they apply for those schools in the future,” App. in No. 05-908, at 30a. The fact that it is possible that children of group members will not be denied admission to a school *719 based on their race — because they choose an undersubscribed school or an oversubscribed school in which their race is an advantage — does not eliminate the injury claimed. Moreover, Parents Involved also asserted an interest in not being “forced to compete for seats at certain high schools in a system that uses race as a deciding factor in many of its admissions decisions.” Ibid. As we have held, one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff, Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 211 (1995); Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville, 508 U. S. 656, 666 (1993), an injury that the members of Parents Involved can validly claim on behalf of their children.
In challenging standing, Seattle also notes that it has ceased using the racial tiebreaker pending the outcome of this litigation. Brief for Respondents in No. 05-908, at 16-17. But the district vigorously defends the constitutionality of its race-based program, and nowhere suggests that if this litigation is resolved in its favor it will not resume using race to assign students. Voluntary cessation does not moot a case or controversy unless “subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,” Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U. S. 167, 189 (2000) (quoting United States v. Concentrated Phosphate Export Assn., Inc., 393 U. S. 199, 203 (1968); internal quotation marks omitted), a heavy burden that Seattle has clearly not met.
Jefferson County does not challenge our jurisdiction, Tr. of Oral Arg. in No. 05-915, p. 48, but we are nonetheless obliged to ensure that it exists, Arbaugh v. Y & H Corp., 546 U. S. 500, 514 (2006). Although apparently Joshua has now been granted a transfer to Bloom, the school to which transfer was denied under the racial guidelines, Tr. of Oral Arg. in No. 05-915, at 45, the racial guidelines apply at all grade *720 levels. Upon Joshua’s enrollment in middle school, he may again be subject to assignment based on his race. In addition, Meredith sought damages in her complaint, which is sufficient to preserve our ability to consider the question. Los Angeles v. Lyons, 461 U. S. 95, 109 (1983).
Ill
A
It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that aetion is reviewed under strict scrutiny. Johnson v. California, 543 U. S. 499,505-506 (2005); Grutter v. Bollinger, 539 U. S. 306, 326 (2003); Adarand, supra, at 224. As the Court recently reaffirmed, “‘racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.’” Gratz v. Bollinger, 539 U. S. 244, 270 (2003) (quoting Fullilove v. Klutznick, 448 U. S. 448, 537 (1980) (Stevens, J., dissenting); brackets omitted). In order to satisfy this searching standard of review, the school districts must demonstrate that the use of individual racial classifications in the assignment plans here under review is “narrowly tailored” to achieve a “compelling” government interest. Adarand, supra, at 227.
Without attempting in these cases to set forth all the interests a school district might assert, it suffices to note that our prior eases, in evaluating the use of racial classifications in the school context, have recognized two interests that qualify as compelling. The first is the compelling interest of remedying the effects of past intentional discrimination. See Freeman v. Pitts, 503 U. S. 467, 494 (1992). Yet the Seattle public schools have not shown that they were ever segregated by law, and were not subject to court-ordered desegregation decrees. The Jefferson County public schools were previously segregated by law and were subject to a desegregation decree entered in 1975. In 2000, the District Court that entered that decree dissolved it, finding that Jefferson *721 County had “eliminated the vestiges associated with the former policy of segregation and its pernicious effects,” and thus had achieved “unitary” status. Hampton, 102 F. Supp. 2d, at 360. Jefferson County accordingly does not rely upon an interest in remedying the effects of past intentional discrimination in defending its present use of race in assigning students. See Tr. of Oral Arg. in No. 05-915, at 38.
Nor could it. We have emphasized that the harm being remedied by mandatory desegregation plans is the harm that is traceable to segregation, and that “the Constitution is not violated by racial imbalance in the schools, without more.” Milliken v. Bradley, 433 U. S. 267, 280, n. 14 (1977). See also Freeman, supra, at 495-496; Dowell, 498 U. S., at 248; Milliken v. Bradley, 418 U. S. 717, 746 (1974). Once Jefferson County achieved unitary status, it had remedied the constitutional wrong that allowed race-based assignments. Any continued use of race must be justified on some other basis.[10]
*722 The second government interest we have recognized as compelling for purposes of strict scrutiny is the interest in diversity in higher education upheld in Grutter, 539 U. S., at 328. The specific interest found compelling in Grutter was student body diversity “in the context of higher education.” Ibid. The diversity interest was not focused on race alone but encompassed “all factors that may contribute to student body diversity.” Id., at 337. We described the various types of diversity that the law school sought:
“[The law school’s] policy makes clear there are many possible bases for diversity admissions, and provides examples of admittees who have lived or traveled widely abroad, are fluent in several languages, have overcome personál adversity and family hardship, have exceptional records of extensive community service, and have had successful careers in other fields.” Id., at 338 (brackets and internal quotation marks omitted).
The Court quoted the articulation of diversity from Justice Powell’s opinion in Regents of Univ. of Cal. v. Bakke, 438 U. S. 265 (1978), noting that “it is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, that can justify the use of race.” Grutter, supra, at 324-325 (citing and quoting Bakke, supra, at 314-315 (opinion of Powell, J.); brackets and internal quotation marks omitted). Instead, what was upheld in Grutter was consideration of “a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.” 539 U. S., at 325 (quoting Bakke, supra, at 315 (opinion of Powell, J.); internal quotation marks omitted).
The entire gist of the analysis in Grutter was that the admissions program at issue there focused on each applicant as an individual, and not simply as a member of a particular racial group. The classification of applicants by race upheld *723 in Grutter was only as part of a “highly individualized, holistic review,” 539 U. S., at 337. As the Court explained, “[t]he importance of this individualized consideration in the context of a race-conscious admissions program is paramount.” Ibid. The point of the narrow tailoring analysis in which the Grutter Court engaged was to ensure that the use of racial classifications was indeed part of a broader assessment of diversity, and not simply an effort to achieve racial balance, which the Court explained would be “patently unconstitutional.” Id., at 330.
In the present cases, by contrast, race is not considered as part of a broader effort to achieve “exposure to widely diverse people, cultures, ideas, and viewpoints,” ibid.; race, for some students, is determinative standing alone. The districts argue that other factors, such as student preferences, affect assignment decisions under their plans, but under each plan when race comes into play, it is decisive by itself. It is not simply one factor weighed with others in reaching a decision, as in Grutter; it is the factor. Like the University of Michigan undergraduate plan struck down in Gratz, 539 U. S., at 275, the plans here “do not provide for a meaningful individualized review of applicants” but instead rely on racial classifications in a “nonindividualized, mechanical” way, id., at 276, 280 (O’Connor, J., concurring).
Even when it comes to race, the plans here employ only a limited notion of diversity, viewing race exclusively in white/ nonwhite terms in Seattle and black/“other” terms in Jefferson County.[11] But see Metro Broadcasting, Inc. v. FCC, 497 U. S. 547, 610 (1990) (O’Connor, J., dissenting) (“We are a Nation not of black and white alone, but one teeming with di *724 vergent communities knitted together by various traditions and carried forth, above all, by individuals”). The Seattle “Board Statement Reaffirming Diversity Rationale” speaks of the “inherent educational value” in “[providing students the opportunity to attend schools with diverse student enrollment,” App. in No. 05-908, at 128a, 129a. But under the Seattle plan, a school with 50 percent Asian-American students and 50 percent white students but no African-American, Native-American, or Latino students would qualify as balanced, while a school with 30 percent Asian-American, 25 percent African-American, 25 percent Latino, and 20 percent white students would not. It is hard to understand how a plan that could allow these results can be viewed as being concerned with achieving enrollment that is “ ‘broadly diverse,’ ” Grutter, supra, at 329.
Prior to Grutter, the courts of appeals rejected as unconstitutional attempts to implement race-based assignment plans — such as the plans at issue here — in primary and secondary schools. See, e. g., Eisenberg v. Montgomery Cty. Public Schools, 197 F. 3d 123, 133 (CA4 1999); Tuttle v. Arlington Cty. School Bd., 195 F. 3d 698, 701 (CA4 1999) (per curiam); Wessmann v. Gittens, 160 F. 3d 790, 809 (CA1 1998). See also Ho v. San Francisco Unified School Dist., 147 F. 3d 854, 865 (CA9 1998). After Grutter, however, the two Courts of Appeals in these cases, and one other, found that race-based assignments were permissible at the elementary and secondary level, largely in reliance on that case. See Parents Involved VII, 426 F. 3d, at 1166; McFarland II, 416 F. 3d, at 514; Comfort v. Lynn School Comm., 418 F. 3d 1, 13 (CA1 2005) (en banc).
In upholding the admissions plan in Grutter, though, this Court relied upon considerations unique to institutions of higher education, noting that in light of “the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition.” 539 U. S., at 329. See also Bakke, *725 438 U. S., at 312, 313 (opinion of Powell, J.). The Court explained that “[e]ontext matters" in applying striet scrutiny, and repeatedly noted that it was addressing the use of race “in the context of higher education.” Grutter, supra, at 327, 328, 334. The Court in Grutter expressly articulated key limitations on its holding — defining a specific type of broad-based diversity and noting the unique context of higher education — but these limitations were largely disregarded by the lower courts in extending Grutter to uphold race-based assignments in elementary and secondary schools. The present cases are not governed by Grutter.
B
Perhaps recognizing that reliance on Grutter cannot sustain their plans, both school districts assert additional interests, distinct from the interest upheld in Grutter, to justify their race-based assignments. In briefing and argument before this Court, Seattle contends that its use of race helps to reduce racial concentration in schools and to ensure that racially concentrated housing patterns do not prevent nonwhite students from having access to the most desirable schools. Brief for Respondents in No. 05-908, at 19. Jefferson County has articulated a similar goal, phrasing its interest in terms of educating its students “in a racially integrated environment.” App. in No. 05-915, at 22.[12] Each school district argues that educational and broader socialization benefits flow from a racially diverse learning environment, and each contends that because the diversity they seek *726 is racial diversity — not the broader diversity at issue in Grutter — it makes sense to promote that interest directly by relying on race alone.
The parties and their amici dispute whether racial diversity in schools in fact has a marked impact on test scores and other objective yardsticks or achieves intangible socialization benefits. The debate is not one we need to resolve, however, because it is clear that the racial classifications employed by the districts are not narrowly tailored to the goal of achieving the educational and social benefits asserted to flow from racial diversity. In design and operation, the plans are directed only to racial balance, pure and simple, an objective this Court has repeatedly condemned as illegitimate.
The plans are tied to each district’s specific racial demographics, rather than to any pedagogic concept of the level of diversity needed to obtain the asserted educational benefits. In Seattle, the district seeks white enrollment of between 31 and 51 percent (within 10 percent of “the district white average” of 41 percent), and nonwhite enrollment of between 49 and 69 percent (within 10 percent of “the district minority average” of 59 percent). App. in No. 05-908, at 103a. In Jefferson County, by contrast, the district seeks black enrollment of no less than 15 or more than 50 percent, a range designed to be “equally above and below Black student enrollment systemwide,” McFarland I, 330 F. Süpp. 2d, at 842, based on the objective of achieving at “all schools . . . an African-American enrollment equivalent to the average district-wide African-American enrollment” of 34 percent, App. in No. 05-915, at 81. In Seattle, then, the benefits of racial diversity require enrollment of at least 31 percent white students; in Jefferson County, at least 50 percent. There must be at least 15 percent nonwhite students under Jefferson County’s plan; in Seattle, more than three times that figure. This comparison makes clear that the racial demographics in each district — whatever they happen to be— *727 drive the required “diversity” numbers. The plans here are not tailored to achieving a degree of diversity necessary to realize the asserted educational benefits; instead the plans are tailored, in the words of Seattle’s Manager of Enrollment Planning, Technical Support, and Demographics, to “the goal established by the school board of attaining a level of diversity within the schools that approximates the district’s overall demographics.” App. in No. 05-908, at 42a.
The districts offer no evidence that the level of racial diversity necessary to achieve the asserted educational benefits happens to coincide with the racial demographics of the respective school districts — or rather the white/nonwhite or black/“other” balance of the districts, since that is the only diversity addressed by the plans. Indeed, in its brief Seattle simply assumes that the educational benefits track the racial breakdown of the district. See Brief for Respondents in No. 05-908, at 36 (“For Seattle, ‘racial balance’ is clearly not an end in itself but rather a measure of the extent to which the educational goals the plan was designed to foster are likely to be achieved”). When asked for “a range of percentage that would be diverse,” however, Seattle’s expert said it was important to have “sufficient numbers so as to avoid students feeling any kind of specter of exceptionality.” App. in No. 05-908, at 276a. The district did not attempt to defend the proposition that anything outside its range posed the “specter of exceptionality.” Nor did it demonstrate in any way how the educational and social benefits of racial diversity or avoidance of racial isolation are more likely to be achieved at a school that is 50 percent white and 50 percent Asian-American, which would qualify as diverse under Seattle’s plan, than at a school that is 30 percent Asian-American, 25 percent African-American, 25 percent Latino, and 20 percent white, which under Seattle’s definition would be racially concentrated.
Similarly, Jefferson County’s expert referred to the importance of having “at least 20 percent” minority group repre *728 sentation for the group “to be visible enough to make a difference,” and noted that “small isolated minority groups in a school are not likely to have a strong effect on the overall school.” App. in No. 05-915, at 159, 147. The Jefferson County plan, however, is based on a goal of replicating at each school “an African-American enrollment equivalent to the average district-wide African-American enrollment.” Id., at 81. Joshua McDonald’s requested transfer was denied because his race was listed as “other” rather than black, and allowing the transfer would have had an adverse effect on the racial guideline compliance of Young Elementary, the school he sought to leave. .Id., at 21. At the time, however, Young Elementary was 46.8 percent black. Id., at 73. The transfer might have had an adverse effect on the effort to approach districtwide racial proportionality at Young, but it had nothing to do with preventing either the black or “other” group from becoming “small” or “isolated” at Young.
In fact, in each case the extreme measure of relying on race in assignments is unnecessary to achieve the stated goals, even as defined by the districts. For example, at Franklin High School in Seattle, the racial tiebreaker was applied because nonwhite enrollment exceeded 69 percent, and resulted in an incoming ninth-grade class in 2000-2001 that was 30.3 percent Asian-American, 21.9 percent African-American, 6.8 percent Latino, 0.5 percent Native-American, and 40.5 percent Caucasian. Without the racial tiebreaker, the class would have been 39.6 percent Asian-American, 30.2 percent African-American, 8.3 percent Latino, 1.1 percent Native-American, and 20.8 percent Caucasian. See App. in No. 05-908, at 308a. When the actual racial breakdown is considered, enrolling students without regard to their race yields a substantially diverse student body under any definition of diversity.[13]
*729 In Grutter, the number of minority students the school sought to admit was an undefined “meaningful number” necessary to achieve a genuinely diverse student body. 539 U. S., at 316,335-336. Although the matter was the subject of disagreement on the Court, see id., at 346-347 (Scalia, J., concurring in part and dissenting in part); id., at 382-383 (Rehnquist, C. J., dissenting); id., at 388-392 (Kennedy, J., dissenting), the majority concluded that the law school did not count back from its applicant pool to arrive at the “meaningful number” it regarded as necessary to diversify its student body. Id., at 335-336. Here the racial balance the districts seek is a defined range set solely by reference to the demographics of the respective school districts.
This working backward to achieve a particular type of racial balance, rather than working forward from some demonstration of the level of diversity that provides the purported benefits, is a fatal flaw under our existing precedent. We have many times over reaffirmed that “[r] acial balance is not *730 to be achieved for its own sake.” Freeman, 503 U. S., at 494. See also Richmond v. J A. Croson Co., 488 U. S. 469, 507 (1989); Bakke, 438 U. S., at 307 (opinion of Powell, J.) (“If petitioner’s purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected... as facially invalid”). Grutter itself reiterated that “outright racial balancing” is “patently unconstitutional.” 539 U. S., at 330.
Accepting racial balancing as a compelling state interest would justify the imposition of racial proportionality throughout American society, contrary to our repeated recognition that “[a]t the heart of the Constitution’s guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.” Miller v. Johnson, 515 U. S. 900, 911 (1995) (quoting Metro Broadcasting, 497 U. S., at 602 (O’Connor, J., dissenting); internal quotation marks omitted).[14] Allowing racial balancing as a compelling end in itself would “effectively assur[e] that race will always be relevant in American life, and that the ‘ultimate goal’ of ‘eliminating entirely from governmental decisionmaking such irrelevant factors as a human being’s race’ will never be achieved.” Croson, supra, at 495 (plurality opinion of O’Connor, J.) (quoting Wygant v. Jackson Bd. of Ed., 476 U. S. 267, 320 (1986) (Stevens, J., dissenting), in turn quoting Fullilove, 448 U. S., at 547 (Stevens, J., *731 dissenting); brackets and citation omitted). An interest “linked to nothing other than proportional representation of various races ... would support indefinite use of racial classifications, employed first to obtain the appropriate mixture of racial views and then to ensure that the [program] continues to reflect that mixture.” Metro Broadcasting, supra, at 614 (O’Connor, J., dissenting).
The validity of our concern that racial balancing has “no logical stopping point,” Croson, supra, at 498 (quoting Wygant, supra, at 275 (plurality opinion); internal quotation marks omitted); see also Grutter, supra, at 343, is demonstrated here by the degree to which the districts tie their racial guidelines to their demographics. As the districts’ demographics shift, so too will their definition of racial diversity. See App. in No. 05-908, at 103a (describing application of racial tiebreaker based on “current white percentage” of 41 percent and “current minority percentage” of 59 percent (emphasis added)).
The Ninth Circuit below stated that it “share[d] in the hope” expressed in Grutter that in 25 years racial preferences would no longer be necessary to further the interest identified in that case. Parents Involved VII, 426 F. 3d, at 1192. But in Seattle the plans are defended as necessary to address the consequences of racially identifiable housing patterns. The sweep of the mandate claimed by the district is contrary to our rulings that remedying past societal discrimination does not justify race-conscious government action. See, e. g., Shaw v. Hunt, 517 U. S. 899, 909-910 (1996) (“[A]n effort to alleviate the effects of societal discrimination is not a compelling interest”); Croson, supra, at 498-499; Wygant, 476 U. S., at 276 (plurality opinion) (“Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy”); id., at 288 (O’Connor, J., concurring in part and concurring in judgment) (“[A] governmental agency’s interest in remedying ‘societal’ discrimina *732 tion, that is, discrimination not traceable to its own actions, cannot be deemed sufficiently compelling to pass constitutional muster”).
The principle that racial balancing is not permitted is one of substance, not semantics. Racial balancing is not transformed from “patently unconstitutional” to a compelling state interest simply by relabeling it “racial diversity.” While the school districts use various verbal formulations to describe the interest they seek to promote — racial diversity, avoidance of racial isolation, racial integration — they offer no definition of the interest that suggests it differs from racial balance. See, e. g., App. in No. 05-908, at 257a (“Q. What’s your understanding of when a school suffers from racial isolation?” “A. I don’t have a definition for that”); id., at 228a-229a (“I don’t think we’ve ever sat down and said, ‘Define racially concentrated school exactly on point in quantitative terms.’ I don’t think we’ve ever had that conversation”); Tr. in McFarland I, at 1-90 (Dec. 8, 2003) (“Q.” “How does the Jefferson County School Board define diversity . . . ?” “A. Well, we want to have the schools that make up the percentage of students of the population”).
Jefferson County phrases its interest as “racial integration,” but integration certainly does not require the sort of racial proportionality reflected in its plan. Even in the context of mandatory desegregation, we have stressed that racial proportionality is not required, see Milliken, 433 U. S., at 280, n. 14 (“[A desegregation] order contemplating the substantive constitutional right [to a] particular degree of racial balance or mixing is ... infirm as a matter of law” (internal quotation marks omitted)); Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U. S. 1, 24 (1971) (“The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole”), and here Jefferson County has already been found to have eliminated the vestiges of its prior segregated school system.
*733 The en banc Ninth Circuit declared that “when a racially diverse school system is the goal (or racial concentration or isolation is the problem), there is no more effective means than a consideration of race to achieve the solution.” Parents Involved VII, supra, at 1191. For the foregoing reasons, this conclusory argument cannot sustain the plans. However closely related race-based assignments may be to achieving racial balance, that itself cannot be the goal, whether labeled “racial diversity” or anything else. To the extent the objective is sufficient diversity so that students see fellow students as individuals rather than solely as members of a racial group, using means that treat students solely as members of a racial group is fundamentally at cross-purposes with that end.
C
The districts assert, as they must, that the way in which they have employed individual racial classifications is necessary to achieve their stated ends. The minimal effect these classifications have on student assignments, however, suggests that other means would be effective. Seattle’s racial tiebreaker results, in the end, only in shifting a small number of students between schools. Approximately 307 student assignments were affected by the racial tiebreaker in 2000-2001; the district was able to track the enrollment status of 293 of these students. App. in No. 05-908, at 162a. Of these, 209 were assigned to a school that was one of their choices, 87 of whom were assigned to the same school to which they would have been assigned without the racial tiebreaker. Eighty-four students were assigned to schools that they did not list as a choice, but 29 of those students would have been assigned to their respective school without the racial tiebreaker, and 3 were able to attend one of the oversubscribed schools due to waitlist and capacity adjustments. Id., at 162a-163a. In over one-third of the assignments affected by the racial tiebreaker, then, the use of race in the end made no difference, and the district could identify *734 only 52 students who were ultimately affected adversely by the racial tiebreaker in that it resulted in assignment to a school they had not listed as a preference and to which they would not otherwise have been assigned.
As the panel majority in Parents Involved VI concluded:
“[T]he tiebreaker’s annual effect is thus merely to shuffle a few handfuls of different minority students between a few schools — about a dozen additional Latinos into Ballard, a dozen black students into Nathan Hale, perhaps two dozen Asians into Roosevelt, and so on. The District has not met its burden of proving these marginal changes . .. outweigh the cost of subjecting hundreds of students to disparate treatment based solely upon the color of their skin.” 377 F. 3d, at 984-985.
Similarly, Jefferson County’s use of racial classifications has only a minimal effect on the assignment of students. Elementary school students are assigned to their first- or second-choice school 95 percent of the time, and transfers, which account for roughly 5 percent of assignments, are only denied 35 percent of the time — and presumably an even smaller percentage are denied on the basis of the racial guidelines, given that other factors may lead to a denial. McFarland I, 330 F. Supp. 2d, at 844-845, nn. 16, 18. Jefferson County estimates that the racial guidelines account for only 3 percent of assignments. Brief in Opposition in No. 05-915, p. 7, n. 4; Tr. of Oral Arg. in No. 05-915, at 46. As Jefferson County explains, “the racial guidelines have minimal impact in this process, because they ‘mostly influence student assignment in subtle and indirect ways.’” Brief for Respondents in No. 05-915, pp. 8-9.
While we do not suggest that greater use of race would be preferable, the minimal impact of the districts’ racial classifications on school enrollment casts doubt on the necessity of using racial classifications. In Grutter, the consideration of race was viewed as indispensable in more than tripling mi *735 nority representation at the law school — from 4 to 14.5 percent. See 539 U. S., at 320. Here the most Jefferson County itself claims is that “because the guidelines provide a firm definition of the Board’s goal of racially integrated schools, they ‘provide administrators with the authority to facilitate, negotiate and collaborate with principals and staff to maintain schools within the 15-50% range.’ ” Brief in Opposition in No. 05-915, at 7 (quoting McFarland I, supra, at 842). Classifying and assigning schoolchildren according to a binary conception of race is an extreme approach in light of our precedents and our Nation’s history of using race in public schools, and requires more than such an amorphous end to justify it.
The districts have also failed to show that they considered methods other than explicit racial classifications to achieve their stated goals. Narrow tailoring requires “serious, good faith consideration of workable race-neutral alternatives,” Grutter, supra, at 339, and yet in Seattle several alternative assignment plans — many of which would not have used express racial classifications — were rejected with little or no consideration. See, e. g., App. in No. 05-908, at 224a-225a, 253a-259a, 307a. Jefferson County has failed to present any evidence that it considered alternatives, even though the district already claims that its goals are achieved primarily through means other than the racial classifications. Brief for Respondents in No. 05-915, at 8-9. Cf. Croson, 488 U. S., at 519 (Kennedy, J., concurring in part and concurring in judgment) (racial classifications permitted only “as a last resort”).
IV
Justice Breyer’s dissent takes a different approach to these cases, one that fails to ground the result it would reach in law. Instead, it selectively relies on inapplicable precedent and even dicta while dismissing contrary holdings, alters and misapplies our well-established legal framework for assessing equal protection challenges to express racial classi *736 fications, and greatly exaggerates the consequences of today’s decision.
To begin with, Justice Breyer seeks to justify the plans at issue under our precedents recognizing the compelling interest in remedying past intentional discrimination. See post, at 819-825. Not even the school districts go this far, and for good reason. The distinction between segregation by state action and racial imbalance caused by other factors has been central to our jurisprudence in this area for generations. See, e. g., Milliken, 433 U. S., at 280, n. 14; Freeman, 503 U. S., at 495-496 (“Where resegregation is a product not of state action but of private choices, it does not have constitutional implications”). The dissent elides this distinction between de jure and defacto segregation, casually intimates that Seattle’s school attendance patterns reflect illegal segregation, post, at 806, 819-820, 824,[15] and fails to credit the judicial determination — under the most rigorous standard— that Jefferson County had eliminated the vestiges of prior segregation. The dissent thus alters in fundamental ways not only the facts presented here but the established law.
Justice Breyer’s reliance on McDaniel v. Barresi, 402 U. S. 39 (1971), post, at 824-825, 830, highlights how far removed the discussion in the dissent is from the question actually presented in these cases. McDaniel concerned a Georgia school system that had been segregated by law There was no doubt that the county had operated a “dual school *737 system,” 402 U. S., at 41, and no one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies — whether or not a court had issued an order to that effect. See supra, at 720-721. The present cases are before us, however, because the Seattle school district was never segregated by law, and the Jefferson County district has been found to be unitary, having eliminated the vestiges of its prior dual status. The justification for race-conscious remedies in McDaniel is therefore not applicable here. The dissent’s persistent refusal to accept this distinction — its insistence on viewing the racial classifications here as if they were just like the ones in McDaniel, “devised to overcome a history of segregated public schools,” post, at 848 — explains its inability to understand why the remedial justification for racial classifications cannot decide these cases.
Justice Breyer’s dissent next relies heavily on dicta from Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U. S., at 16—far more heavily than the school districts themselves. Compare post, at 804-805, 823-829, with Brief for Respondents in No. 05-908, at 19-20; Brief for Respondents in No. 05-915, at 31. The dissent acknowledges that the two-sentence discussion in Swann was pure dicta, post, at 823, but nonetheless asserts that it demonstrates a “basic principle of constitutional law” that provides “authoritative legal guidance,” post, at 823, 831. Initially, as the Court explained just last Term, “we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated.” Central Va. Community College v. Katz, 546 U. S. 356, 363 (2006). That is particularly true given that, when Swann was decided, this Court had not yet confirmed that strict scrutiny applies to racial classifications like those before us. See n. 16, infra. There is nothing “technical” or “theoretical,” post, at 831, about our approach to such dicta. See, e. g., Cohens v. Virginia, 6 Wheat. 264, 399-400 (1821) (Marshall, C. J.) (explaining why dicta is not binding).
*738 Justice Breyer would not only put such extraordinary weight on admitted dicta, but relies on the statement for something it does not remotely say. Swann addresses only a possible state objective; it says nothing of the permissible means — race conscious or otherwise — that a school district might employ to achieve that objective. The reason for this omission is clear enough, since the case did not involve any voluntary means adopted by a school district. The dissent’s characterization of Swann as recognizing that “the Equal Protection Clause permits local school boards to use race-conscious criteria to achieve positive race-related goals” is— at best — a dubious inference. Post, at 823. Even if the dicta from Swann were entitled to the weight the dissent would give it, and no dicta is, it not only did not address the question presented in Swann, it also does not address the question presented in these cases — whether the school districts’ use of racial classifications to achieve their stated goals is permissible.
Further, for all the lower court cases Justice Breyer cites as evidence of the “prevailing legal assumption,” post, at 827, embodied by Swann, very few are pertinent. Most are not. For example, the dissent features Tometz v. Board of Ed., Waukegan City School Dist. No. 61, 39 Ill. 2d 593, 597-598, 237 N. E. 2d 498, 501 (1968), as evidence that “state and federal courts had considered the matter settled and uncontroversial.” Post, at 825. But Tometz addressed a challenge to a statute requiring race-consciousness in drawing school attendance boundaries — an issue well beyond the scope of the question presented in these cases. Importantly, it considered that issue only under rational-basis review, 39 Ill. 2d, at 600, 237 N. E. 2d, at 502 (“The test of any legislative classification essentially is one of reasonableness”), which even the dissent grudgingly recognizes is an improper standard for evaluating express racial classifications. Other cases cited are similarly inapplicable. See, e. g., Citizens for Better Ed. v. Goose Creek Consol. Independent School Dist., *739 719 S. W. 2d 350, 352-353 (Tex. App. 1986) (upholding rezoning plan under rational-basis review).[16]
Justice Breyer’s dissent next looks for authority to a footnote in Washington v. Seattle School Dist. No. 1, 458 *740 U. S. 457, 472, n. 15 (1982), post, at 857, but there this Court expressly noted that it was not passing on the propriety of race-conscious student assignments in the absence of a finding of de jure segregation. Similarly, the citation of Crawford v. Board of Ed. of Los Angeles, 458 U. S. 527 (1982), post, at 825, in which a state referendum prohibiting a race-based assignment plan was challenged, is inapposite — in Crawford the Court again expressly reserved the question presented by these cases. 458 U. S., at 535, n. 11. Such reservations and preliminary analyses of course did not decide the merits of this question — as evidenced by the disagreement among the lower courts on this issue. Compare Eisenberg, 197 F. 3d, at 133, with Comfort, 418 F. 3d, at 13.
Justice Breyer’s dissent also asserts that these cases are controlled by Grutter, claiming that the existence of a compelling interest in these cases “follows a fortiori’ from Grutter, post, at 842,864-866, and accusing us of tacitly overruling that case, see post, at 864-866. The dissent over-reads Grutter, however, in suggesting that it renders pure racial balancing a constitutionally compelling interest; Grutter itself recognized that using race simply to achieve racial balance would be “patently unconstitutional,” 539 U. S., at 330. The Court was exceedingly careful in describing the interest furthered in Grutter as “not an interest in simple ethnic diversity” but rather a “far broader array of qualifications and characteristics” in which race was but a single element. Id., at 324-325 (internal quotation marks omitted). We take the Grutter Court at its word. We simply do not understand how Justice Breyer can maintain that classifying every schoolchild as black or white, and using that classification as a determinative factor in assigning children to achieve pure racial balance, can be regarded as “less burdensome, and hence more narrowly tailored” than the consideration of race in Grutter, post, at 847, when the Court in Grutter stated that “[t]he importance of . . . individualized consideration” in the program was “paramount,” and consid *741 eration of race was one factor in a “highly individualized, holistic review,” 539 U. S., at 337. Certainly if the constitutionality of the stark use of race in these cases were as established as the dissent would have it, there would have been no need for the extensive analysis undertaken in Grutter. In light of the foregoing, Justice Breyer’s appeal to stare decisis rings particularly hollow. See post, at 866.
At the same time it relies on inapplicable desegregation cases, misstatements of admitted dicta, and other noncontrolling pronouncements, Justice Breyer’s dissent candidly dismisses the significance of this Court’s repeated holdings that all racial classifications must be reviewed under strict scrutiny, see post, at 831-834,836-837, arguing that a different standard of review should be applied because the districts use race for beneficent rather than malicious purposes, see post, at 832-837.
This Court has recently reiterated, however, that ‘“all racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny.’” Johnson, 543 U. S., at 505 (quoting Adarand, 515 U. S., at 227; emphasis added by Johnson Court). See also Grutter, supra, at 326 (“[Governmental action based on race — a group classification long recognized as in most circumstances irrelevant and therefore prohibited — should be subjected to detailed judicial inquiry” (internal quotation marks and emphasis omitted)). Justice Breyer nonetheless relies on the good intentions and motives of the school districts, stating that he has found “no case that... repudiated this constitutional asymmetry between that which seeks to exclude and that which seeks to include members of minority races.” Post, at 830 (emphasis in original). We have found many. Our cases clearly reject the argument that motives affect the strict scrutiny analysis. See Johnson, supra, at 505 (“We have insisted on strict scrutiny in every context, even for so-called ‘benign’ racial classifications”); Adarand, supra, at 227 (rejecting idea that “ ‘benign’ ” racial classifications may *742 be held to “different standards”); Croson, 488 U. S., at 500 (“Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice”).
This argument that different rules should govern racial classifications designed to include rather than exclude is not new; it has been repeatedly pressed in the past, see, e. g., Gratz, 539 U. S., at 282 (Breyer, J., concurring in judgment); id., at 301 (Ginsburg, J., dissenting); Adarand, supra, at 243 (Stevens, J., dissenting); Wygant, 476 U. S., at 316-317 (Stevens, J., dissenting), and has been repeatedly rejected. See also Bakke, 438 U. S., at 289-291 (opinion of Powell, J.) (rejecting argument that strict scrutiny should be applied only to classifications that disadvantage minorities, stating “[rjacial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination”).
The reasons for rejecting a motives test for racial classifications are clear enough. “The Court’s emphasis on ‘benign racial classifications’ suggests confidence in its ability to distinguish good from harmful governmental uses of racial criteria. History should teach greater humility. . . . ‘[Bjenign’ carries with it no independent meaning, but reflects only acceptance of the current generation’s conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable.” Metro Broadcasting, 497 U. S., at 609-610 (O’Connor, J., dissenting). See also Adarand, supra, at 226 (“ ‘[I]t may not always be clear that a so-called preference is in fact benign’” (quoting Bakke, supra, at 298 (opinion of Powell, J.))). Accepting Justice Breyer’s approach would “do no more than move us from ‘separate but equal’ to ‘unequal but benign.’ ” Metro Broadcasting, supra, at 638 (Kennedy, J., dissenting).
Justice Breyer speaks of bringing “the races” together (putting aside the purely black-and-white nature of the plans) as the justification for excluding individuals on the basis of their race. See post, at 829-830. Again, this ap *743 proach to racial classifications is fundamentally at odds with our precedent, which makes clear that the Equal Protection Clause “protects] persons, not groups,” Adarand, 515 U. S., at 227 (emphasis in original). See ibid. (“[A]ll governmental action based on race — a group classification long recognized as ‘in most circumstances irrelevant and therefore prohibited,’ Hirabayashi [v. United States, 320 U. S. 81, 100 (1943)]—should be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed” (emphasis in original)); Metro Broadcasting, supra, at 636 (Kennedy, J., dissenting) (“[0]ur Constitution protects each citizen as an individual, not as a member of a group”); Bakke, supra, at 289 (opinion of Powell, J.) (The Fourteenth Amendment creates rights “‘guaranteed to the individual. The rights established are personal rights’ ”). This fundamental principle goes back, in this context, to Brown itself. See Brown v. Board of Education, 349 U. S. 294, 300 (1955) (Brown II) (“At stake is the personal interest of the plaintiffs in admission to public schools ... on a non-discriminatory basis” (emphasis added)). For the dissent, in contrast, “‘individualized scrutiny’ is simply beside the point.” Post, at 855.
Justice Breyer’s position comes down to a familiar claim: The end justifies the means. He admits that “there is a cost in applying ‘a state-mandated racial label,’ ” post, at 867, but he is confident that the cost is worth paying. Our established strict scrutiny test for racial classifications, however, insists on “detailed examination, both as to ends and as to means.” Adarand, supra, at 236 (emphasis added). Simply because the school districts may seek a worthy goal does not mean they are free to discriminate on the basis of race to achieve it, or that their racial classifications should be subject to less exacting scrutiny.
Despite his argument that these cases should be evaluated under a “standard of review that is not ‘strict’ in the traditional sense of that word,” Justice Breyer still purports *744 to apply strict scrutiny to these cases. See post, at 837. It is evident, however, that Justice Breyer’s brand of narrow tailoring is quite unlike anything found in our precedents. Without any detailed discussion of the operation of the plans, the students who are affected, or the districts’ failure to consider race-neutral alternatives, the dissent concludes that the districts have shown that these racial classifications are necessary to achieve the districts’ stated goals. This conclusion is divorced from any evaluation of the actual impact of the plans at issue in these cases — other than to note that the plans “often have no effect.” Post, at 846.[17] Instead, the dissent suggests that some combination of the development of these plans over time, the difficulty of the endeavor, and the good faith of the districts suffices to demonstrate that these stark and controlling racial classifications are constitutional. The Constitution and our precedents require more.
In keeping with his view that strict scrutiny should not apply, Justice Breyer repeatedly urges deference to local school boards on these issues. See, e. g., post, at 822, 848-849, 866. Such deference “is fundamentally at odds with our equal protection jurisprudence. We put the burden on state actors to demonstrate that their race-based policies are justified.” Johnson, 543 U. S., at 506, n. 1. See Croson, supra, at 501 (“The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in *745 equal protection analysis”); West Virginia Bd. of Ed. v. Barnette, 319 U. S. 624, 637 (1943) (“The Fourteenth Amendment ... protects the citizen against the State itself and all of its creatures — Boards of Education not excepted”).
Justice Breyer’s dissent ends on an unjustified note of alarm. It predicts that today’s decision “threaten[s]” the validity of “[hjundreds of state and federal statutes and regulations.” Post, at 861; see also post, at 828-829. But the examples the dissent mentions — for example, a provision of the No Child Left Behind Act of 2001 that requires States to set measurable objectives to track the achievement of students from major racial and ethnic groups, 20 U. S. C. § 6311(b)(2)(C)(v) (2000 ed., Supp. IV) — have nothing to do with the pertinent issues in these cases.
Justice Breyer also suggests that other means for achieving greater racial diversity in schools are necessarily unconstitutional if the racial classifications at issue in these cases cannot survive strict scrutiny. Post, at 858-862. These other means — e. g., where to construct new schools, how to allocate resources among schools, and which academic offerings to provide to attract students to certain schools— implicate different considerations than the explicit racial classifications at issue in these cases, and we express no opinion on their validity — not even in dicta. Rather, we employ the familiar and well-established analytic approach of strict scrutiny to evaluate the plans at issue today, an approach that in no way warrants the dissent’s cataclysmic concerns. Under that approach, the school districts have not carried their burden of showing that the ends they seek justify the particular extreme means they have chosen — classifying individual students on the basis of their race and discriminating among them on that basis.
* * *
If the need for the racial classifications embraced by the school districts is unclear, even on the districts’ own terms, the costs are undeniable. “[Distinctions between citizens *746 solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.” Adarand, 515 U. S., at 214 (internal quotation marks omitted). Government action dividing us by race is inherently suspect because such classifications promote “notions of racial inferiority and lead to a politics of racial hostility,” Croson, 488 U. S., at 493 (plurality opinion), “reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin,” Shaw v. Reno, 509 U. S. 630, 657 (1993), and “endorse race-based reasoning and the conception of a Nation divided into raeial blocs, thus contributing to an escalation of racial hostility and conflict.” Metro Broadcasting, 497 U. S., at 603 (O’Connor, J., dissenting). As the Court explained in Rice v. Cayetano, 528 U. S. 495, 517 (2000), “[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities.”
All this is true enough in the contexts in which these statements were made — government contracting, voting districts, allocation of broadcast licenses, and electing state officers— but when it comes to using race to assign children to schools, history will be heard. In Brown v. Board of Education, 347 U. S. 483 (1954) (Brown I), we held that segregation deprived black children of equal educational opportunities regardless of whether school facilities and other tangible factors were equal, because government classification and separation on grounds of race themselves denoted inferiority. Id., at 493-494. It was not the inequality of the facilities but the fact of legally separating children on the basis of race on which the Court relied to find a constitutional violation in 1954. See id., at 494 (“‘The impact [of segregation] is greater when it has the sanction of the law’”). The next Term, we accordingly stated that “full compliance” with Brown I required school districts “to achieve a system of *747 determining admission to the public schools on a nonracial basis.” Brown II, 349 U. S., at 300-301 (emphasis added).
The parties and their amici debate which side is more faithful to the heritage of Brown, but the position of the plaintiffs in Brown was spelled out in their brief and could not have been clearer: “[T]he Fourteenth Amendment prevents states from according differential treatment to American children on the basis of their color or race.” Brief for Appellants in Nos. 1,2, and 4 and for Respondents in No. 10 on Reargument in Brown I, O. T. 1953, p. 15 (Summary of Argument). What do the racial classifications at issue here do, if not accord differential treatment on the basis of race? As counsel who appeared before this Court for the plaintiffs in Brown put it: “We have one fundamental contention which we will seek to develop in the course of this argument, and that contention is that no State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens.” Tr. of Oral Arg. in Brown I, O. T. 1952, No. 8, p. 7 (Robert L. Carter, Dec. 9, 1952). There is no ambiguity in that statement. And it was that position that prevailed in this Court, which emphasized in its remedial opinion that what was “[a]t stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis,” and what was required was “determining admission to the public schools on a nonracial basis.” Brown II, supra, at 300-301 (emphasis added). What do the racial classifications do in these cases, if not determine admission to a public school on a racial basis?
Before Brown, schoolchildren were told where they could and could not go to school based on the color of their skin. The school districts in these cases have not carried the heavy burden of demonstrating that we should allow this once again — even for very different reasons. For schools that never segregated on the basis of race, such as Seattle, or that have removed the vestiges of past segregation, such as *748 Jefferson County, the way “to achieve a system of determining admission to the public schools on a nonracial basis,” Brown II, supra, at 300-301, is to stop assigning students on a racial basis. The way to stop discrimination on the basis of race is to stop discriminating on the basis of race.
The judgments of the Courts of Appeals for the Sixth and Ninth Circuits are reversed, and the cases are remanded for further proceedings.

It is so ordered.

 The plan was in effect from 1999-2002, for three school years. This litigation was commenced in July 2000, and the record in the District Court was closed before assignments for the 2001-2002 school year were made. See Brief for Respondents in No. 05-908, p. 9, n.' 9. We rely, as did the lower courts, largely on data from the 2000-2001 school year in evaluating the plan. See 426 P. 3d 1162, 1169-1171 (CA9 2005) (en banc) (Parents Involved VII).

 The racial breakdown of this nonwhite group is approximately 23.8 percent Asian-American, 23.1 percent African-American, 10.3 percent Latino, and 2.8 percent Native-American. See 377 F. 3d 949, 1005-1006 (CA9 2004) (Parents Involved VI) (Graber, J., dissenting).

 For the 2001-2002 school year, the deviation permitted from the desired racial composition was'increased from 10 to 15 percent. App. in No. 05-908, p. 38a. The bulk of the data in the record was collected using the 10 percent band, see n. 1, supra.

 “No State shall... deny to any person within its jurisdiction the equal protection of the laws.” U. S. Const., Arndt. 14, § 1.

 “No person in the United States shall, on the ground of race ... be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.” 78 Stat. 252, 42 U. S. C. §2000d.

 “The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.” Wash. Rev. Code §49.60.400(1) (2006).

 Middle and high school students are designated a single resides school and assigned to that school unless it is at the extremes of the racial guidelines. Students may also apply to a magnet school or program, or, at the high school level, take advantage of an open enrollment plan that allows ninth-grade students to apply for admission to any nonmagnet high school. App. in No. 05-915, pp. 39-41, 82-83.

 It is not clear why the racial guidelines were even applied to Joshua’s transfer application — the guidelines supposedly do not apply at the kindergarten level. Id., at 43. Neither party disputes, however, that Joshua’s transfer application was denied under the racial guidelines, and Meredith’s objection is not that the guidelines were misapplied but rather that race was used at all.

 Meredith joined a pending lawsuit filed by several other plaintiffs. See id., at 7-11. The other plaintiffs all challenged assignments to certain specialized schools, and the District Court found these assignments, which are no longer at issue in this case, unconstitutional. McFarland I, 330 F. Supp. 2d 834, 837, 864 (WD Ky. 2004).

 The districts point to dicta in a prior opinion in which the Court suggested that, while not constitutionally mandated, it would be constitutionally permissible for a school district to seek racially balanced schools as a matter of “educational policy.” See Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U. S. 1, 16 (1971). The districts also quote with approval an in-chambers opinion in which then-justice Rehnquist made a suggestion to the same effect. See Bustop, Inc. v. Los Angeles Bd. of Ed., 489 U. S. 1380, 1383 (1978). The citations do not carry the significance the districts would ascribe to them. Swann, evaluating a school district engaged in court-ordered desegregation, had no occasion to consider whether a district’s voluntary adoption of race-based assignments in the absence of a finding of prior de jure segregation was constitutionally permissible, an issue that was again expressly reserved in Washington v. Seattle School Dist. No. 1, 458 U. S. 457, 472, n. 15 (1982). Bustop, addressing in the context of an emergency injunction application a busing plan imposed by the Superior Court of Los Angeles County, is similarly unavailing. Then-Justice Rehnquist, in denying emergency relief, stressed that “equitable consideration^]” counseled against preliminary relief. 439 U. S., at 1383. The propriety of preliminary relief and resolution of the merits are of course “significantly different” issues. University of Texas v. Camenisch, 451 U. S. 390, 393 (1981).

 The way Seattle classifies its students bears this out. Upon enrolling their child with the district, parents are required to identify their child as a member of a particular racial group. If a parent identifies more than one race on the form, “[t]he application will not be accepted and, if necessary, the enrollment service person taking the application will indicate one box.” App. in No. 05-908, at 303a.

 Jefferson County also argues that it would be incongruous to hold that what was constitutionally required of it one day — race-based assignments pursuant to the desegregation decree — can be constitutionally prohibited the next. But what was constitutionally required of the district prior to 2000 was the elimination of the vestiges of prior segregation — not racial proportionality in its own right. See Freeman v. Pitts, 503 U. S. 467, 494-496 (1992). Once those vestiges were eliminated, Jefferson County was on the same footing as any other school district, and its use of race must be justified on other grounds.

 Data for the Seattle schools in the several years since this litigation was commenced further demonstrate the minimal role that the racial tiebreaker in fact played. At Ballard, in 2005-2006 — when no class at the *729 school was subject to the racial tiebreaker — the student body was 14.2 percent Asian-American, 9 percent African-American, 11.7 percent Latino, 62.3 percent Caucasian, and 2.8 percent Native-American. Reply Brief for Petitioner in No. 05-908, p. 7. In 2000-2001, when the racial tiebreaker was last used, Ballard’s total enrollment was 17.5 percent Asian-American, 10.8 percent African-American, 10.7 percent Latino, 56.4 percent Caucasian, and 4.6 percent Native-American. App. in No. 05-908, at 283a. Franklin in 2005-2006 was 48.9 percent Asian-American, 33.5 percent African-American, 6.6 percent Latino, 10.2 percent Caucasian, and 0.8 percent Native-American. Reply Brief for Petitioner in No. 05-908, at 7. With the racial tiebreaker in 2000-2001, total enrollment was 36.8 percent Asian-American, 32.2 percent African-American, 5.2 percent Latino, 25.1 percent Caucasian, and 0.7 percent Native-American. App. in No. 05-908, at 284a Nathan Hale’s 2005-2006 enrollment was 17.3 percent Asian-American, 10.7 percent African-American, 8 percent Latino, 61.5 percent Caucasian, and 2.5 percent Native-American. Reply Brief for Petitioner in No. 05-908, at 7. In 2000-2001, with the racial tiebreaker, it was 17.9 percent Asian-American, 13.3 percent African-American, 7 percent Latino, 58.4 percent Caucasian, and 3.4 percent Native-American. App. in No. 05-908, at 286a.

 In contrast, Seattle’s Web site formerly described “emphasizing individualism as opposed to a more collective ideology” as a form of “cultural racism,” and currently states that the district has no intention “‘to hold onto unsuccessful concepts such as [a]... colorblind mentality.’ ” Harrell, School Web Site Removed: Examples of Racism Sparked Controversy, Seattle Post-Intelligencer, June 2,2006, pp. Bl, B5. Compare Plessy v. Ferguson, 163 U. S. 537, 559 (1896) (Harlan, J., dissenting) (“Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law”).

 Justice Breyer makes much of the fact that in 1978 Seattle “settled” an NAACP complaint alleging illegal segregation with the federal Office for Civil Rights- (OCR). See post, at 807, 810, 819, 824. The memorandum of agreement between Seattle and OCR, of course, contains no admission by Seattle that such segregation ever existed or was ongoing at the time of the agreement, and simply reflects a “desire to avoid the incovenience [sic] and expense of a formal OCR investigation,” which OCR was obligated under law to initiate upon the filing of such a complaint. Memorandum of Agreement between Seattle School District No. l of King County, Washington, and the OCR, U. S. Dept. of Health, Education, and Welfare 2 (June 9,1978); see also 45 CFR § 80.7(c) (2006).

 In fact, all the cases Justice Breyer’s dissent cites as evidence of the “prevailing legal assumption,” see post, at 825-828, were decided before this Court definitively determined that “all racial classifications . . . must be analyzed by a reviewing court under strict scrutiny.” Adarand Constructors, Inc. v. Peña, 515 U. S. 200, 227 (1995). Many proceeded under the now-rejected view that classifications seeking to benefit a disadvantaged racial group should be held to a lesser standard of review. See, e. g., Springfield School Comm. v. Barksdale, 348 F. 2d 261, 266 (CA1 1965). Even if this purported distinction, which Justice Stevens would adopt, post, at 799-800, n. 3 (dissenting opinion), had not been already rejected by this Court, the distinction has no relevance to these cases, in which students of all races are excluded from the schools they wish to attend based solely on the racial classifications. See, e.g., App. in No. 05-908, at 202a (noting that 89 nonwhite students were denied assignment to a particular school by operation of Seattle’s racial tiebreaker).
Justice Stevens’s reliance on School Comm. of Boston v. Board of Ed., 352 Mass. 693, 227 N. E. 2d 729 (1967), appeal dism’d, 389 U. S. 572 (1968) (per curiam), post, at 800-803, is inapposite for the same reason that many of the cases cited by Justice Breyer are inapposite; the case involved a Massachusetts law that required school districts to avoid racial imbalance in schools but did not specify how to achieve this goal — and certainly did not require express racial classifications as the means to do so. The law was upheld under rational-basis review, with the state court explicitly rejecting the suggestion — which is now plainly the law — that “racial group classifications bear a far heavier burden of justification.” 352 Mass., at 700, 227 N. E. 2d, at 734 (internal quotation marks omitted). The passage Justice Stevens quotes proves our point; all the quoted language says is that the school committee “shall prepare a plan to eliminate imbalance.” Id., at 695, 227 N. E. 2d, at 731; see post, at 801, n. 5. Nothing in the opinion approves use of racial classifications as the means to address the imbalance. The suggestion that our decision today is somehow inconsistent with our disposition of that appeal is belied by the fact that neither the lower courts, the respondent school districts, nor any of their 51 amici saw fit even to cite the case. We raise this fact not to argue that the dismissal should be afforded any different stare decisis effect, but rather simply to suggest that perhaps — for the reasons noted above — the dismissal does not mean what Justice Stevens believes it does.

 Justice Breyer also tries to downplay the impact of the racial assignments by stating that in Seattle “students can decide voluntarily to transfer to a preferred district high school (without any consideration of race-conscious criteria).” Post, at 846. This presumably refers to the district’s decision to cease, for 2001-2002 school year assignments, applying the racial tiebreaker to students seeking to transfer to a different school after ninth grade. See App. in No. 05-908, at 137a-139a. There are obvious disincentives for students to transfer to a different school after a full quarter of their high school experience has passed, and the record sheds no light on how transfers to the oversubscribed high schools are handled.