# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 6, 2011

No. 10-30378

Lyle W. Cayce
Clerk

JANE DOE, on behalf of Jill Doe, on behalf of Joan Doe,

Plaintiff - Appellant

v.

VERMILION PARISH SCHOOL BOARD; RANDY SCHEXNAYDER, Individually and in his official capacity as Superintendent of the Vermilion Parish School Board; BILL SEARLE, Individually and in his official capacity as member of the Vermilion Parish School Board; ANGELA FAULK, Individually and in her official capacity as member of the Vermilion Parish School Board; DEXTER CALLAHAN, Individually and in his official capacity as member of the Vermilion Parish School Board; RICKY LEBOUEF, Individually and in his official capacity as member of the Vermilion Parish School Board; ANTHONY FONTANA, Individually and in his official capacity as member of the Vermilion Parish School Board; CHARLES CAMPBELL, individually and in his official capacity as member of the Vermilion Parish School Board; CHRIS MAYARD, Individually and in his official capacity as member of the Vermilion Parish School Board; RICKY BROUSSARD, Individually and in his official capacity as member of the Vermilion Parish School Board; DAVID DUPUIS, Individually and in his official capacity as Principal of Rene A. Rost Middle School,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:09-CV-1565

Before BARKSDALE, STEWART, and SOUTHWICK, Circuit Judges.

No. 10-30378

Leslie H. Southwick, Circuit Judge:[*]

Plaintiff Jane Doe, on behalf of her two minor daughters, filed suit against the Vermilion Parish School Board. She claimed that single-sex classes were being conducted in violation of the Constitution and federal law. The current appeal is from the district court's denial of a preliminary injunction.

We AFFIRM.

## FACTUAL AND PROCEDURAL HISTORY

Jane Doe is the mother of Joan and Jill Doe, who attend public schools operated by the Vermilion Parish School Board ("Vermilion" or the "Board"). During the 2009-2010 school year, Joan was an eighth-grader and Jill a sixth-grader at Rene A. Rost Middle School. At school orientation on August 4, 2009, Doe learned that her daughters had been placed in core classes in which only girls were allowed. This assignment was mandatory.

A little more than a month later, Doe filed suit in the United States District Court for the Western District of Louisiana. She claimed that the Board's single-sex education program violated various federal regulations implementing Title IX, the Equal Protection Clause of the Fourteenth Amendment, and other laws. She sought injunctive and other relief.

The record reveals that Rost Middle School Principal David Dupuis initiated the single-sex education program. In 2008, he asked the Board to allow him to conduct an experiment for his doctoral dissertation in which some eighth-graders would be placed in single-sex classes during the middle third of the 2008-2009 school year. His proposal included studies describing the benefits of single-sex education, but he did not include studies that identified negative consequences of such education. The Board approved his request.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

No. 10-30378

In June 2009, Dupuis presented the Board with a summary of the results. His data showed significantly improved academic performance and a 52 percent decline in behavioral problems during the single-sex term. He claimed that grades declined after the students returned to coed classes.

Dupuis's data was inaccurate. The district court said "it sure looks like he fudged a bunch of the numbers" in order to support his conclusion that single-sex education improved academic performance. Doe's expert analyzed the school's grading records and testified that grades actually declined during the period of single-sex education.

Dupuis's analysis of the behavioral data was also inaccurate. He admitted in court that the introduction of a state-mandated "positive behavior support" system had improved student behavior, not single-sex education.

In 2009, Vermilion's superintendent and Board were unaware of these problems and were "impressed" with Dupuis's purported results. The Board voted to approve single-sex education "at any of the middle schools on an optional basis based on what the staff and administration at the school felt." In discovery, Vermilion admitted that Dupuis's research and presentations were the sole basis for the Board's decision to justify the new program. In court, the superintendent added that the Board also relied upon the input of teachers and a few parents who favored single-sex education.

After securing Board approval, Rost Middle School assigned students for the 2009-2010 school year to single-sex classes in each core subject, which are math, science, language arts, social studies, and reading. In each grade, two all-boy and two all-girl classes were designated. A fifth class was coeducational. Parents were first told of the single-sex classes at the August orientation.

Counsel for Doe soon thereafter wrote school officials to contend that the program was illegal, in part because the single-sex classes were not voluntary. The superintendent testified that after reviewing the letter, he and the Board's

No. 10-30378

attorney determined that "we were exactly in violation. . . . We weren't aware of the law.  We didn't go back and research it to see the proper way of doing that. . . . [W]e were in violation.  There is no doubt about it."

"The law" to which the superintendent was referring was a set United States Department of Education regulations on structuring a program of same-sex classes.   In 2006, the Department of Education issued regulations authorizing public schools to offer single-sex education options under certain conditions.  Generally speaking, single-sex public education is permitted when:

> (i) Each single-sex class or extracurricular activity is based on the [school's][1] important objective--
>> (A) To improve educational achievement of its students, through a [school's] overall established policy to provide diverse educational opportunities, provided that the single-sex nature of the class or extracurricular activity is substantially related to achieving that objective; or
>> (B) To meet the particular, identified educational needs of its students, provided that the single-sex nature of the class or extracurricular activity is substantially related to achieving that objective;
>
> (ii) The [school] implements its objective in an evenhanded manner;
> (iii) Student enrollment in a single-sex class or extracurricular activity is completely voluntary; and
> (iv) The [school] provides to all other students, including students of the excluded sex, a substantially equal coeducational class or extracurricular activity in the same subject or activity.

34 C.F.R. § 106.34(b)(1)(i)-(iv).

The regulations list certain exceptions to this general standard and detail how single-sex education programs will be reviewed.  *Id*. § 106.34(a), (b)(4).  For example, every two years a participating school must evaluate its program

> to ensure that single-sex classes or extracurricular activities are based upon genuine justifications and do not rely on overly broad generalizations about the different talents, capacities, or preferences of either sex and that any single-sex classes or extracurricular

---

[1] We have substituted the word "recipient" with "school" for simplicity.

No. 10-30378

activities are substantially related to the achievement of the important objective for the classes or extracurricular activities.

*Id.* § 106.34(b)(4)(i).[2]   The Department of Education and the Department of Justice have filed an amicus brief in this case describing these regulations as permitting a narrow exception to the general rule of coeducation.

These regulations provide some foundation for a public school's attempt to experiment with single-sex education.  We express no view today on whether these regulations are contrary to Title IX, the Equal Protection Clause, or the other authorities Doe cites.  At this stage, we note only that there is some currently-existing authority for a school to utilize same-sex programs to improve educational outcomes.

Upon learning of these regulations, the Board attempted to confirm its program by making the single-sex classes voluntary.  It provided consent forms to parents and asked them to mark whether they wanted single-sex or coed classes for their children.

After the consent forms were received, though, Dupuis made a series of phone calls to parents who had selected coed classes.  He convinced over 30 families to move their children into single-sex classes.  There is no evidence that he called a parent who initially chose single-sex to discuss the possibility of switching to coed.  As a result, Rost Middle School's coed classes for the 2009-2010 school year were 73 percent boys and 27 percent girls, when the population of the school was closer to 55 percent boys and 45 percent girls.

Doe first sought to have both daughters opt out.  Her older daughter Joan remained in the single-sex class after Dupuis talked to Joan at school about her

---

[2] The regulations sought to apply the Supreme Court's decision in *United States v. Virginia*, 518 U.S. 515 (1996), which interpreted the Equal Protection Clause of the Fourteenth Amendment in the context of single-sex public higher education.  71 Fed. Reg. 62530-01, 62535-38 (Oct. 25, 2006).

No. 10-30378

placement.  The younger daughter, Jill, was transferred into a coed class at the time the complaint was filed.

Doe learned that these coed classes were disproportionately filled with students with special needs and Individual Education Plans ("IEPs").[3]  Parents of these students stated Vermilion had threatened to abandon their child's IEP if they elected the single-sex class.  One parent said Principal Dupuis encouraged her to move her child into the single-sex class because her child would be "pushed harder" there and that single-sex was "a better class"; Dupuis admitted the former quote but denied saying the latter.

Of the 38 IEP students with more severe impairments, 37 were placed into coed classes.  At the same time, all of the IEP students that were "talented and gifted" were spread throughout the single-sex classes.[4]

As a result of these assignments, the average GPA of students in coed classes was, for the fifth, sixth, and eighth grades, a minimum of 0.4 points, or approximately half a grade, below the average GPA of students in single-sex classes.  The results for the seventh grade were less uniform, but the coed classes generally had lower GPAs than the single-sex classes.

While Vermilion intentionally placed IEP students in the coed section, it was not clear whether it did so to encourage other students to select single-sex classes, for teacher convenience, or for other reasons.  There apparently had been a prior request from a teacher to group the IEP students in one classroom.

There were several other differences between the coed and single-sex classes.  The coed classes had physically and mentally disabled students come in for one hour of instruction each day; those students never came into the

---

[3] IEPs are part of the mechanism to implement the federal Individuals with Disabilities Education Act.  *See* 20 U.S.C. § 1400 *et seq*.

[4] At Rost Middle School in 2009-2010, a total of 69 students had IEPs.  Seventeen of these students were also classified as "talented and gifted."

single-sex classes. Similarly, a group of students working toward their GED occasionally came into the coed classes but never into the single-sex classes.

This evidence reveals differences between the two categories of classes. Even so, Vermilion's pleadings described its single-sex education program as "equal but separate." It argued that regardless of the classroom composition, each of the core courses was "taught by the same teacher with the same state-mandated curriculum, same tests, same schedule, same resources, same classroom and same materials." Vermilion asserted that this "substantial equality" was permitted by the Department of Education regulations.

Vermilion acknowledged at least one intentional deviation from the "equal but separate" concept. It would use different teaching strategies in the single-sex classes "in order to tailor learning toward the strengths and needs of boys or girls." This included assigning different books to boys and girls based on their perceived interests. It also included teaching with "action techniques" with boys but "a more quiet environment" with girls. Vermilion says it continues to use sex-based "differential teaching strategies" during the current school year.

On April 19, 2010, the district court issued its ruling. The court described a number of problems with Vermilion's single-sex program, including "significant flaws" in Dupuis's data and "an extreme lack of oversight over this program at the fault of both the Vermilion Parish School Board and Principal David Dupuis." The court held that any discrimination by Vermilion was unintentional, and on that basis denied Doe's motion for injunctive relief.

The district court went further than just denying the injunction. Citing "the best interests of the children," the court ordered Vermilion to follow a 10-step plan to implement single-sex education during the 2010-2011 school year. The plan required, among other things, better parental notice about single-sex education, two additional coed sections in each grade, a more even gender distribution of students, and IEP services in each type of classroom. It also

allowed parents who objected to single-sex education to move their child to any fully-coed public school nearest their residence. Several of these improvements had been suggested by Vermilion in a post-hearing memorandum. Doe appealed.

The duration of the court's order is uncertain. The order required Vermilion "to implement the following plan in future school years with supervision by the Court for one year." What is clear is that the court's oversight ends with the imminent expiration of the current school year.

In May 2010, Joan Doe completed eighth grade and graduated from Rost Middle School. Jill Doe is now a seventh grader, enrolled again in a coed class.

## DISCUSSION

This court has jurisdiction over "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions." *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 204 (5th Cir. 2010) (quoting 28 U.S.C. § 1292(a)(1)) (quotation marks omitted).

Our jurisdiction extends to the entire order from which Doe appeals, including that portion of the order that required Vermilion to take certain steps in administering its 2010-2011 single-sex education program. "[A]n order granting or refusing an injunction brings before the appellate court the entire order, not merely the propriety of injunctive relief . . . ." *Magnolia Marine Transp. Co. v. Laplace Towing Corp.*, 964 F.2d 1571, 1580 (5th Cir. 1992) (quotation marks and citation omitted).

A preliminary injunction is not to be issued lightly. *See Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009). *A fortiori*, an appellate court should with at least equal care consider whether to order a preliminary injunction that a district court denied. We review a district court's decision on an injunction for an abuse of discretion, regardless of whether it was granted or denied. *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006).

No. 10-30378

When the decision is based on errors of law, we review it *de novo. Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001).

After finding "significant flaws" in Vermilion's justification for single-sex education, as well as Vermilion's negligent oversight of that program, the district court concluded that the program was lawful because there was no intentional discrimination.

A plaintiff who claims that a governmental classification explicitly based on sex violates the Equal Protection Clause, though, does not have to show discriminatory intent. *See Virginia*, 518 U.S. at 531, 533; *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-73 (1979). Instead, courts are to apply intermediate scrutiny. *See LeClerc v. Webb*, 419 F.3d 405, 420 (5th Cir. 2005). Intermediate scrutiny places the burden "entirely on the State" to demonstrate an "exceedingly persuasive" justification for the classification. *Virginia*, 518 U.S. at 533.

In addition to the Equal Protection issue, the district court did not address Doe's remaining arguments that Vermilion's single-sex education program violated: (1) the plain language of Title IX; (2) Title IX implementing regulations from the United States Departments of Agriculture, Health and Human Services, and Homeland Security; and (3) the 2006 Department of Education regulations on single-sex education we quoted above.

> For a preliminary injunction, each element of this test must be satisfied:
>
> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Speaks*, 445 F.3d at 399-400 (citation omitted). The district court did not discuss these factors, but as we noted, it denied an injunction for other reasons.

9

No. 10-30378

Vermilion argues that we need not reach the merits because we should dismiss the appeal for lack of standing and mootness. We address these arguments first, cognizant that the "actual case or controversy must exist in every stage in the judicial process." *Motient Corp. v. Dondero*, 529 F.3d 532, 537 (5th Cir. 2008) (citation omitted); *see* U.S. Const. art. III, § 2.

We conclude that there is standing, but based on the current record we cannot determine if the issues surrounding future injunctive relief are moot.

*I.     Standing*

Vermilion does not contest that Joan, the older daughter, had standing to bring the suit. Joan was enrolled in a single-sex class in 2009-2010, and graduated from Rost Middle School in May 2010.

As to the younger daughter, Jill, Vermilion argues that she lacks standing to challenge same-sex classes because she was and currently is enrolled in a coed class. After being moved from a single-sex class into a coed class in September 2009, Jill remained in the coed class throughout that school year. She is again enrolled in a coed class this school year. Vermilion contends that as a non-participant, Jill has not been injured by the single-sex program. Doe responds that she is injured by being subjected to a discriminatory practice, that Vermilion's single-sex program denies her "the benefit of a true coeducational education," and that she testified to the specifics of how her coed education is unequal and inadequate.

To establish standing, "a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Mass. v. E.P.A.*, 549 U.S. 497, 517 (2007) (citation omitted). Here, only the first element is disputed.

We find some guidance in the Supreme Court's analysis of standing for parents who challenged a public school assignment policy utilizing race as a

factor. *Parents Involved in Cmty. Schs v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 713, 718 (2007). The Seattle school district allowed incoming ninth-grade students to apply to attend any of its high schools. *Id.* at 711. When a school was too popular or unpopular, one of the factors the district would use to select which students would attend was the applicant's race. *Id.* at 711-12. The district wanted a certain degree of racial balance and used the circumstance of the over- and under-subscribed schools to strive toward that balance. *Id.*

The district argued that the parent group lacked standing for future injunctive relief because the injuries its members claimed were too speculative, *i.e.*, only if their children applied to a school that had too many applicants would race become a factor; even when that occurred, the factor of race might actually advantage the applicant. *Id.* at 718-19. Chief Justice Roberts held the plaintiffs had standing. *Id.* He wrote that "one form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff, an injury that the members of Parents Involved can validly claim on behalf of their children." *Id.* at 719 (citations omitted).

The Court relied on a previous decision in which a contractor was held to have standing when he complained of having to compete for federal projects that gave an advantage to bidders who employed minority subcontractors. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 204 (1995). Even though the contractor sought injunctive relief, which necessarily would apply to future contracts in which the result of its bid could not yet be known, the Court held there was standing. *Id.* at 212. In reaching that decision, the *Adarand* opinion applied the requirements for Article III standing that a plaintiff have suffered an injury that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 211 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)) (quotation marks omitted). The allegations supported that Adarand

was prevented "from competing on an equal footing." *Id.* (quotation marks and citation omitted).

In our case, Jill's argument on standing is not the same as in *Parents Involved* or *Adarand*. In these two precedents, the injury was potentially missing out on being admitted to the school a plaintiff perceived to be best, or not to get a contract for which it had not yet bid. *Parents Involved*, 551 U.S. at 719; *Adarand*, 515 U.S. at 212. Jill's argument basically is that the sex-classification at her school has reduced the quality of education. There is no "best school" to which Jill could not be admitted or advantage she was denied that others are receiving.

Jill's claim of standing is that the creation of same-sex classes has prevented her from getting the education she would otherwise receive. Her examples of shortcomings include that there are a disproportionate number of IEP students in Rost Middle School's coed classrooms. Further, based on her experience in both kinds of classrooms, she testified that the coed classroom: (1) used different subject-matter tests; (2) had a teacher's aide that spoke loudly to other students and distracted her; and (3) had a teacher read tests aloud. She also said other students taunted her for being in the "special needs class."

Therefore, standing for Jill is based on the argument that both the coed and the same-sex classes are inferior to what would be available were this program not in place. Girls are effectively denied the benefits of being in the same classroom with boys. Though there is a coed class in which those benefits would be available, the argument is that the same-sex classes prevent quality coed classes from being offered. She also argues that girls are subjected to an unfavorable education and teaching methods based on stereotypes. There is some evidence to support that. She further alleges that her own coed classroom has been modified unfavorably by the imposition of gender sorting.

No. 10-30378

Though there are distinctions that can be made from *Parents Involved* and *Adarand*, we accept that Jill's allegations of injury, resulting from a diminished quality of education due to the creation of same-sex classes, are sufficient to confer standing.

## II.   *Mootness*

The Supreme Court has referred to mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397 (1980) (quoting Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)) (quotation marks omitted).

Both parties agree that this interlocutory appeal is moot as to Joan Doe because she graduated from Rost Middle School in May 2010. Any injunctive relief this court could provide would not apply to her. "As is so often the case in suits for injunctive relief brought by students, graduation or impending graduation renders their claims for injunctive relief moot" as they "will not benefit from a favorable ruling[.]" *Pederson v. La. State Univ.*, 213 F.3d 858, 874 (5th Cir. 2000) (citations omitted). Joan's claims for damages, though, can proceed in the district court. *See id.* at 875.

### A.   *Mootness as to Jill for the 2009-2011 School Years*

The harder question is whether the issue of an injunction is moot as to Jill, who remains a student at the school. She is a seventh-grader in the school year that will soon end, and may attend Rost Middle School for one more year after that. Vermilion's central argument as to mootness regarding Jill is that "in both her complaint and in her motion for injunctive relief, plaintiff sought relief only with regards to the 2009-2010 school year which concluded in May of 2010 and, as a result, there is no pending case or controversy." This is an argument that

No. 10-30378

the issue Doe presented to the district court was limited to the 2009-2010 school year.  *See Harris v. City of Houston*, 151 F.3d 186, 190-91 (5th Cir. 1998).

We begin our analysis of whether that is a fair characterization by looking closely at Doe's September 8, 2009, motion for injunctive relief.  There we find a request to halt single-sex education at Rost Middle School "in the 2009-2010 academic year."

Somewhat differently, the first and last sentence of that same motion requested injunctive relief until "decision on the merits in this case"; similarly, the proposed order attached to Doe's brief in support of the motion was not time-limited.  Doe's complaint, filed the same day, also requested a permanent injunction to prevent "Defendants from segregating any class or educational program by sex" and "[p]ermanently enjoin all Defendants . . . to take all affirmative steps necessary . . . to prevent similar future occurrences."  This reflects Doe's argument that no amended policy or procedural improvement can save single-sex public education.

The record after the September 2009 complaint is also instructive.  On January 5, 2010, the district court notified the parties that, "to be quite honest with you, I don't think anything is going to change for this school year but it could change for next school year one way or the other." Vermilion did not object to carrying Doe's motion and applying it to the 2010-2011 school year.  That is the school year, though nearing the end, in which our decision is being issued.

Throughout the parties' voluminous filings in Spring 2010, neither characterized Doe's request for relief as time-limited.  Vermilion offered a "Proposed Plan for 2010-2011 School Year" containing eight paragraphs of improvements for a continued single-sex education program. Vermilion's current arguments about the temporal limitations on the injunction are inconsistent with the arguments it made in district court.

14

No. 10-30378

Further, during the hearing on injunctive relief, Jane Doe personally asked that any injunction not take effect during the 2009-2010 school year because it could disrupt the students and impede state testing. She instead asked the court to return the school to coeducation starting in the 2010-2011 school year. Vermilion did not object and instead solicited testimony from its officials that Rost Middle School could make appropriate changes to its single-sex education program for the 2010-2011 school year.

The district court's order required Vermilion "to implement the following plan in future school years with supervision by the Court for one year." Until further order of the court, then, or perhaps until Vermilion decided no longer to have same-sex classes, the rules outlined in the order were to be followed.

In summary, we accept that a close look at the motion by itself would not support that an injunction was explicitly requested beyond a now-passed school year. Such a close look would not resolve the issue, though. "Even if not raised by the pleadings, once issues are presented and argued without objection by opposing counsel, such issues are tried by the implied consent of the parties and are treated as if they had been raised in the pleadings." *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir. 1984) (citing Fed. R. Civ. P. 15(b)). Vermilion suggested in the district court that modifications be made to its program during the 2010-2011 school year. In making that suggestion, it did not contend that Doe's request was time-limited.

There was support in the pleadings, reinforced by the manner in which the issue was presented, and further supported by the actual order from the district court, to indicate that there was a clear issue of enjoining single-sex classes at the time of the motion and into the future.

We also conclude, though, that the propriety of injunctive relief for the first and second relevant school years, *i.e.*, 2009-2010 and 2010-2011, has become effectively moot during the pendency of this appeal. Much for the reasons

15

offered by Doe at the February 2010 hearing in district court applicable to the 2009-2010 year, it is now too late in the 2010-2011 year to order any immediate change in classes. Stopping same-sex classes for the remainder of this school year would not be meaningful relief because it would not benefit anyone and would be sufficiently disruptive to be harmful. *See Pederson*, 213 F.3d at 874. The propriety of that much of the trial court's ruling is functionally moot.

### B.     *Mootness for Future School Years*

The remaining time-frame for our analysis of mootness is that which starts at the end of the current school year and extends into so much of the future as is needed to reach a final resolution in this case. Will Jill continue to have a personal stake in injunctive relief?

The order from which this appeal was taken allowed same-sex classes to continue, denied the preliminary injunction that would have required abandoning same-sex classes beginning with the 2010-2011 school year, and held that only for that school year the court would supervise the operation of the classes. We have interpreted the presentation of these issues in the district court to include a request for an injunction for all subsequent school years pending the resolution of the case on the merits. The injunction requested was denied, but a court order setting certain requirements for future same-sex classes was put in place. That order seemed to continue until altered.

We must ask whether there is enough in this record to resolve whether Jill has a personal stake in the resolution of injunctive relief applicable to all future class years until this matter is resolved on the merits. We do not know if Jill will be enrolled at Rost Middle School in the next school year, whether there will be same-sex classes offered there and, if so, whether they will be in the same form as ordered by the district court for 2010-2011.[5] The court order required

---

[5] A voluntary cessation of single-sex education would not foreclose forward-looking injunctive relief unless "it can be said with assurance that there is no reasonable expectation

same-sex classes to be conducted in a certain way, but we do not interpret it to require such classes to exist.

For all these reasons, we conclude that we cannot determine whether issues are moot regarding the district court's refusal to issue an injunction to bar same-sex classes that would apply to school years after the one now ending. We therefore remand for that determination. If the questions are found not to be moot, then what the future holds will also be for the district court to resolve on remand.

Even without the issues of mootness that cannot be resolved, we also do not find enough in this record to make a *de novo* review of the court's order on the injunction. The four factors relevant to that determination cannot be applied in a factual vacuum. *See Speaks*, 445 F.3d at 399-400. The same factual uncertainties about the future time period to which a preliminary injunction would apply that we just discussed as to mootness, also would require us to remand for further proceedings even were the mootness concerns nonexistent.

We therefore leave undisturbed the April 19, 2010 order that denied Doe's request for an injunction during the pendency of the litigation.

## CONCLUSION

On remand, if Vermilion desires to continue same-sex classes and seeks to justify them under the 2006 Department of Education regulations, the district court must consider whether the classes meet those standards. Unless the issue is avoidable, the district court will then need to consider whether federal law and the Constitution permit that program.

If injunctive relief is again requested, the district court will review what Vermilion proposes for the future. *See ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 445 F.3d 841, 849-50 (5th Cir. 2006) (reconsideration of preliminary

---

. . . that the alleged violation will recur . . . ." *Pederson*, 213 F.3d at 874 (citation omitted); *see Hernandez v. Cremer*, 913 F.2d 230, 235 (5th Cir. 1990).

injunction issues may be appropriate when the facts and circumstances have changed).  Even when a preliminary injunction is appropriate, though, "it is frequently desirable in such cases to expedite the trial on the merits."  *Allied Mktg. Grp, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 815 (5th Cir. 1989) (citation omitted).  The most expedient way for the parties to receive "considered plenary review" on future appeal is to proceed to a decision on the merits.  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 547 (1976).  We encourage the parties to reach the merits on a full record before again presenting this court with these issues.  *See Black Fire Fighters Ass'n of Dallas v. City of Dallas, Tex.*, 905 F.2d 63, 66 (5th Cir. 1990).

AFFIRMED.  Vermilion's motion to dismiss the appeal is DENIED.  The cause is REMANDED.