*356 KING, Circuit Judge,
concurring in part and dissenting in part:
In reversing the district court’s grant of summary judgment, the majority creates a fact issue where none exists. Plaintiff Darrin Kenny Lewis’s only claim on appeal is that the Ascension Parish School Board allocated a disproportionately large number of at-risk students to East Ascension High School and its feeder schools, which adversely impacted the education of minority children at those predominately minority schools. Lewis, however, failed to present any evidence that the Board intended to discriminate against minority students by placing too many at-risk students in their schools. Because Option 2f, the student assignment plan at issue in this appeal, is facially race neutral and there is no evidence that the Board adopted Option 2f with the intent to discriminate against minorities by targeting their schools with an influx of at-risk students, Lewis’s claim was properly assessed under a rational basis analysis. Lewis failed to present evidence that the Board acted arbitrarily or irrationally, and thus I would affirm the judgment of the district court dismissing Lewis’s claim. I respectfully dissent from the majority’s decision to remand this case for further fact-finding on the Board’s intent in adopting Option 2f and on whether Option 2f had a racially disparate impact.[1]
Although the only relevant evidence of discriminatory intent would pertain to the desire to discriminate against minorities by sending at-risk children to their schools, the majority finds a fact issue regarding intent based on evidence indicating (1) that the Board did not want to disturb the district’s unitary status while addressing the problem of overcrowding and (2) that the Board was aware of the effects Option 2f would likely have on racial demographics and the number of at-risk students assigned to various schools within the district. The desire to maintain unitary status, however, speaks to the racial composition of schools within the district, not the assignment of at-risk students to schools. Thus, this evidence does not pertain to Lewis’s sole claim on appeal. Furthermore, the Supreme Court has been absolutely clear that mere awareness of consequences is insufficient to demonstrate discriminatory intent. Thus, the evidence relied upon by the majority is either unrelated to Lewis’s claim or insufficient to establish it.
In reaching its decision, the majority engages in additional problematic analysis that has potentially far-reaching consequences and threatens to require the application of strict scrutiny to actions taken with a mere awareness of their effects on racial demographics. The majority suggests that Option 2f classifies students by race because a statistical analysis predicting the impact of Option 2f (and, for that matter, all the other options under consideration) tracked the number of African American and at-risk students expected to attend various schools within the district. However, under Option 2f, the determination of which school a student will attend depends only on where the student lives— not on the student’s race. Taking the race of individual students into account when compiling statistics about the probable effects of Option 2f is something very different from assigning individual students to particular schools based on their race. This is a very important distinction, and it is one that the majority fails to make. The majority’s expansive take on what constitutes a racial classification likely functions *357 as a push toward the application of strict scrutiny to any governmental action taken with an awareness of its consequences on racial demographics — information often available to decisionmakers in many contexts. Requiring the application of strict scrutiny in such a broad range of circumstances, however, is at odds with Supreme Court precedent holding that discriminatory intent must be shown for strict scrutiny to apply to facially race-neutral acts and that mere awareness of consequences is not enough to demonstrate discriminatory intent.
Chief Judge Jones’s concurrence also asserts that Option 2f employs explicit racial classifications, arguing that geography functions as a proxy for race in Option 2f. Whether the Board used geography as a proxy for race, however, is not related to what Option 2f says on its face. An explicit classification must be just that — explicit. Determining whether the Board sought to classify students based on their race and did so using geographical lines as pretext involves analysis of the Board’s intent and has no bearing on Option 2fs express terms. That Option 2f is facially race neutral is, in my view, beyond dispute.
The attempts of both the majority and concurring opinions to describe Option 2f as employing explicit racial classifications seem to be geared toward extending the reach of the Supreme Court’s decision in Parents Involved in Community Schools v. Seattle School District No. 1, 551 U.S. 701, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007), to decisions involving the mere awareness of an act’s probable effects on racial demographics. The majority and concurring opinions also seem to push for the application of strict scrutiny to student assignment plans merely because decision-makers show some desire not to upset a school district’s unitary status. However, if the court were to confine itself to the case before it, the case would not provide an appropriate platform to further either of these ends.
In Parents Involved, the Court held that student assignment plans using express racial classifications were not sufficiently narrowly tailored to withstand strict scrutiny. The holding in Parents Involved pertains only to plans using explicit racial classifications, and Option 2f is facially race neutral. Consequently, Parents Involved does not bear directly on the case before us, and the suggestions to the contrary in the majority and concurring opinions inappropriately seek to extend the reach of Parents Involved and the applicability of strict scrutiny.
To be clear, although in the district court Lewis at one time asserted a claim that the Board impermissibly re-assigned too many minority students to attend East Ascension and its feeder schools, he expressly waived that claim on appeal. Nonetheless, the majority continues to rely on and discuss evidence related to the Board’s desire not to disrupt the district’s unitary status. Lewis’s only claim on appeal, however, relates to the placement of at-risk children in schools and has nothing to do with altering or maintaining racial demographics, whether to preserve unitary status or for any other reason. The only discriminatory intent that matters in this appeal is the desire to engage in racial discrimination through the placement of at-risk children in East Ascension and its feeder schools. Thus, whether the Board intended to avoid significantly altering the racial makeup of its schools is an issue we need not, and should not, address.

I. The Nature of Lewis’s Claim

In his complaint, Lewis alleged that “the district lines drawn and adopted by the defendant disproportionately pull African American students and economically disad *358 vantaged students from across the east bank and feed them into East Ascension High School.” Fairly read, Lewis’s complaint challenged two aspects of Option 2f. First, Lewis claimed that the Board impermissibly re-assigned too many minority students to attend East Ascension High School (“East Ascension” or “EAHS”),[2] and second, he claimed that the Board allocated a disproportionately large number of at-risk students to East Ascension and its feeder schools, which adversely impacted the education of minority children attending East Ascension, including his children.[3]
On appeal, Lewis clarified, and in fact insisted, that his claim rests solely on the second aspect of Option 2f. In his opening brief,[4] his reply brief, and at oral argument,[5] Lewis contended that at-risk students adversely impact the educational environment at East Ascension, which in turn disparately impacts minority students because East Ascension has the largest proportion of minority students of the three high schools on the east bank. As Lewis himself appears to recognize, the decision to send a student to one school rather than another because of the student’s race is distinct from the decision to send at-risk students to a certain school because of the high percentage of minority students at that school. He expressly told this court that his claim rests on the second decision, and he no longer asserted any claim based on the first decision. In his opening brief, Lewis began his discussion of the merits of his equal protection claim by stating, “[t]he District Court first incorrectly assumed that Plaintiff based his cause of action on an increase of the minority population at EAHS.” Appellant’s Br. at 30. In his reply brief, Lewis stated:
*359 Once again, Appellant urges that the number/percentage of minority students is not the basis for the Appellant’s cause of action in this matter. The Appellant reasserts that its cause of action exists upon the number/percentage of “at-risk” students being transferred into East Ascension High School and its feeder system .... The transfer of this high number of “at-risk” students to the EAHS feeder system is the action causing injury to the Appellant, who is a minority at EAHS.
Appellant’s Reply Br. at 1-2 (emphasis added). Chief Judge Jones’s concurrence asserts that Lewis’s claim related to gerrymandering or racial balancing is still before us, indicating that Lewis’s statements on appeal merely “clarify, correctly, that the appellant does not believe a magic number or percentage of minority students is per se violative of equal protection.” Jones Concurrence at 2. To the contrary, because Lewis stated that “the number/percentage of minority students is not the basis for the Appellant’s cause of action in this matter,” we can only fairly assume that Lewis meant exactly what he said: “the number/percentage of minority students is not the basis for the Appellant’s cause of action in this matter.” Thus, the majority opinion is correct when it says that the only claim at issue is whether the Board violated the Lewis children’s right to equal protection by assigning a disproportionate number of at-risk students to East Ascension and its feeder schools.

II. Assignment of At-Risk Students to East Ascension

Having established that Lewis claims only that a disproportionate number of at-risk children were assigned to East Ascension and its feeder schools under Option 2f, I turn to the merits of that claim. Lewis’s only argument on appeal with respect to the merits of his equal protection claim is that the district court erred by failing to apply strict scrutiny to the Board’s adoption of Option 2f. He contends that Option 2f is automatically subject to strict scrutiny because it employs racial classifications and, alternatively, that he produced sufficient evidence that the Board acted with a discriminatory motive in assigning a disproportionate number of at-risk students to East Ascension. The district court held that the Board’s decision was subject to rational basis review because Option 2f is facially race neutral and Lewis had not carried his burden to present evidence that the Board acted with a discriminatory purpose. I agree. We should review the Board’s decision for a rational basis, and because Lewis presented no evidence that the decision was arbitrary or irrational, I would affirm the district court’s grant of summary judgment in favor of the Board.

A. Level of Scrutiny

The touchstone in the analysis of any racial discrimination claim is a determination of whether the government acted with “a racially discriminatory intent or purpose.” Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); see also Washington v. Davis, 426 U.S. 229, 239-40, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). If the government has acted with such a purpose, we apply strict scrutiny and examine whether the law is narrowly tailored to further a compelling governmental interest. See Grutter v. Bollinger, 539 U.S. 306, 326-27, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). If the government did not act with such a purpose, we review its decision for a rational basis. Id.
“No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute,” Shaw v. Reno, 509 U.S. 630, 642, 113 S.Ct. 2816, *360 125 L.Ed.2d 511 (1993), or when the law is “unexplainable on grounds other than race,” Village of Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. However, when a racial classification does not appear on the face of the statute, we must conduct a more searching inquiry into the intent of the lawmakers. Strict scrutiny will be applied only if the plaintiff can demonstrate that the government acted with a discriminatory motive. See Vill. of Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. Thus, at the outset, we must determine whether we ought automatically to apply strict scrutiny because Option 2f is facially race conscious, or whether we must conduct a more searching inquiry into the Board’s intent.
1. Option 2f is Facially Race Neutral
Option 2f is facially race neutral and not automatically subject to strict scrutiny for two reasons. First, Lewis challenges only the aspect of Option 2f that assigned additional at-risk students to East Ascension. The decision to assign at-risk students to attend a particular school is race neutral on its face. At-risk students are not a protected class, and the students categorized as at-risk are not limited to a particular race or ethnicity. Option 2f also does not on its face require at-risk students to attend a school with a particular racial makeup.
Second, even examining Option 2f as a whole, the student assignment plan is race neutral. Option 2f is a school assignment plan that tells students where they will attend school based on where their residence is located. Option 2f does not on its face implicate the race of the students. Under Option 2f, if a new family moves into the East Ascension attendance zone, the children will attend East Ascension regardless of race or socio-economic class. Race is simply not a factor in the assignment of students.
Cases in which the Supreme Court has considered the validity of legislative redistricting provide an apt analogy. The Court has consistently stated that the redistricting of legislative districts is facially race neutral, and that a more searching inquiry must be made into the intent of the redistricting body before strict scrutiny will be applied. Bush v. Vera, 517 U.S. 952, 958, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion) (“Electoral district lines are ‘facially race neutral,’ so a more searching inquiry is necessary before strict scrutiny can be found applicable in redistricting cases than in cases of ‘classifications based explicitly on race.’ ” (citation omitted)); Hunt v. Cromartie, 526 U.S. 541, 547, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (“Districting legislation ordinarily, if not always, classifies tracts of land, precincts, or census blocks and is race neutral on its face.”); Shaw, 509 U.S. at 646, 113 S.Ct. 2816 (“A reapportionment statute typically does not classify persons at all; it classifies tracts of land, or addresses.”). Moreover, the Court has indicated that legislative districts may be drawn with an awareness of racial demographics without triggering strict scrutiny. See Miller v. Johnson, 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (“Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process.”); Shaw, 509 U.S. at 646, 113 S.Ct. 2816 (“[Rjedistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.”); Bush, 517 U.S. at 1001, *361 116 S.Ct. 1941 (Thomas, J., concurring) (“We have said that impermissible racial classifications do not follow inevitably from a legislature’s mere awareness of racial demographics.”).
Despite the fact that Option 2f does not even mention race on its face, the majority seems to suggest that Option 2f employs racial classifications. See Maj. Op. at 351 (stating that the students affected by Option 2f “seem[ ] to be a group identifiable and identified principally on racial grounds (whether minority or not) for assignment to particular schools”). To do this, the majority points to a chart that details the demographic projections under each of the plans considered by the Board (the “Statistical Analysis”) and suggests that this analysis should be considered part of Option 2f. See Maj. Op. at 350 (“The School Board insists that the Statistical Analysis underlying Option 2f — submitted by Lewis in opposition to summary judgment — does not constitute Option 2f itself. But to accept that self-serving, summary allegation would be to allow a school district to skew reality simply by selectively including documents in the record and labeling only those documents its ‘plan.’ ”). This chart, which is not part of Option 2f, provides the total expected enrollment for each plan in each school and lists the percentage of African American students and the percentage of students that are expected to receive a free or reduced price lunch (i.e., at-risk students). If Option 2f facially classified students based on race, however, strict scrutiny would automatically apply. The majority does not hold that this is the case and leaves the level of scrutiny to be determined by the district court.
Nonetheless, the majority states that “it is unclear how a student assignment plan could calculate the percentage of black students at each school without classifying individual students by race.” Maj. Op. at 350. In making this statement, the majority appears to condemn the Board for even creating such a chart. But the document does no more than show that the Board was aware of the demographic implications of each plan, and the Supreme Court has never held that a mere awareness of a student’s race is automatically subject to strict scrutiny, much less unconstitutional. Cf. Shaw, 509 U.S. at 646, 113 S.Ct. 2816; Pers. Adm’r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (“ ‘Discriminatory purpose’ ... implies more than intent as volition or intent as awareness of consequences.”). A compilation of demographic information, even racial demographic information, does not by itself suggest a racial classification or a facially race-conscious decision.
Instead, to subject its decision to strict scrutiny, the government must use that demographic information to take action affecting the plaintiff. In every case in which the Court has applied strict scrutiny to a “racial classification,” a racial preference or classification appeared on the face of the government decision and required that action be taken with respect to an individual based on the classification. See Parents Involved, 551 U.S. at 720, 127 S.Ct. 2738 (school district used race to determine whether students would be assigned to their school of choice); Johnson v. California, 543 U.S. 499, 502-05, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005) (state prison used race to determine where inmates would be housed); Gratz v. Bollinger, 539 U.S. 244, 254, 270, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (university awarded admissions “points” to minority applicants); Grutter, 539 U.S. at 314, 326, 123 S.Ct. 2325 (law school used applicant’s race as one factor in admissions process); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 205, 115 S.Ct. 2097, 132 L.Ed.2d 158 *362 (1995) (government gave contractors a financial incentive to hire minority subcontractors); City of Richmond v. J.A. Croson Co., 488 U.S. 469, 477-78, 493-94, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (city mandated that a certain percentage of construction contracts would be awarded only to minority contractors); Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 271, 273-74, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (school laid off nonminority teachers to achieve racial balance between faculty and students); Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 272-73, 290, 357, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (medical school set aside a specified number of spots in the entering class for minority students only); see also Walker v. City of Mesquite, 169 F.3d 973, 980-81 (5th Cir.1999) (declaring invalid city’s decision to build public housing units in “predominantly white areas”); Raso v. Lago, 135 F.3d 11, 16 (1st Cir.1998) (“The term [racial classification] normally refers to a governmental standard, preferentially favorable to one race or another, for the distribution of benefits.” (emphasis added)). None of these cases stands for the proposition that the government’s awareness of race, and the racial demographics of neighborhoods or schools, is a racial classification automatically subject to strict scrutiny.
The Statistical Analysis does not on its face suggest that the Board actually used the document to decide which plan to adopt or that the Board considered race when it undertook to redistrict the attendance zones. For that conclusion, the majority must look to other evidence in the record, such as the deposition testimony of various Board members. Maj. Op. at 350-51. Because Option 2f is facially race neutral, we must review the record to determine whether Lewis presented sufficient evidence that the Board acted with a discriminatory motive when it adopted Option 2f.
Before examining the intent of the Board, I note briefly that Chief Judge Jones’s concurrence goes one step further than the majority opinion to mischaracterize the nature of Option 2f. The concurrence suggests that, in assessing whether Option 2f is facially neutral, it is proper to look behind the face of Option 2f and assess whether any way in which the plan expressly classifies students is actually a proxy for race. See, e.g., Jones Concurrence at 353 (“A further problem is the misperception that when the desired racial balance is achieved by geographical lines, rather than assignment of specific students of certain races, the action is ‘facially neutral’ .... ”); id. at 354 (“The boundaries are only race-neutral because streets are not people. Streets, though, may well be racial proxies because the district or its agents apparently knew and used the racial composition of the people living on those streets to pursue racial balancing.”); id. at 353 (“What matters is the government’s intentional use of racial classifications.”). However, it seems inescapable that a “facial” or “explicit” category would have to be expressed on the face of Option 2f. The inquiry regarding the level of scrutiny does not end with an examination of the face of Option 2f, but the inquiry regarding the explicit classifications Option 2f employs does. Examination of the intent behind the adoption of Option 2f involves a separate analysis.
2. Lewis Has Not Shown that the Board Had a Discriminatory Motive in Assigning At-Risk Students to East Ascension
Although Option 2f is facially race neutral, it nevertheless may be subject to strict scrutiny if the Board adopted the plan with a discriminatory purpose. See Vill. of Arlington Heights, 429 U.S. at 265-66, 97 S.Ct. 555. The majority focus *363 es its attention on whether Lewis presented sufficient evidence that the Board acted with discriminatory motive in re-assigning students based on the race of those students. As I have repeated, Lewis does not challenge that aspect of Option 2f. The only relevant issue is whether the Board acted with a discriminatory purpose or motive when it assigned additional at-risk students to East Ascension.
In Village of Arlington Heights, the Supreme Court set forth a now-familiar test by which we are to determine whether “there is a proof that a discriminatory purpose has been a motivating factor in [a facially neutral government decision].” Id. at 265-66, 97 S.Ct. 555. The Court held that disproportionate impact is but one factor which a plaintiff can use to support a finding of discriminatory purpose. Id. at 265, 97 S.Ct. 555; see also Washington, 426 U.S. at 242, 96 S.Ct. 2040. The plaintiff must also prove that the disproportionate impact is traceable to a discriminatory purpose. Washington, 426 U.S. at 242, 96 S.Ct. 2040 (“Standing alone, [disproportionate impact] does not trigger the rule ... that racial classifications are to be subjected to the strictest scrutiny ----” (citation omitted)); see also Sonnier v. Quarterman, 476 F.3d 349, 368 (5th Cir.2007) (“Even if a neutral law has a disproportionately adverse impact, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.” (internal quotation marks, alteration, and citation omitted)). The Supreme Court identified the following additional factors as relevant in determining whether purposeful discrimination animated a particular action:
(1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision, which may take into account any history of discrimination by the decisionmaking body; (3) the specific sequence of events leading up [to] the challenged decision, including departures from normal procedures; and (4) the legislative or administrative history of the state action, including contemporary statements by decisionmakers.
Allstate Ins. Co. v. Abbott, 495 F.3d 151, 160 (5th Cir.2007) (citing Vill. of Arlington Heights, 429 U.S. at 266-68, 97 S.Ct. 555).
The crux of Lewis’s argument that the Board acted with discriminatory intent is that the assignment of additional at-risk students under Option 2f had a disproportionate impact on the minority students attending East Ascension. Lewis offers the following statistics to support his claim that Option 2f had a disproportionate impact on minority students. Prior to the redistricting under Option 2f, approximately 43 percent of the students enrolled at East Ascension were “at risk.” At Dutch-town High School (“Dutchtown”) the at-risk population was approximately 19 percent, and at St. Amant High School (“St. Amant”) the at-risk population was approximately 24 percent.[6] Without any redistricting, the Board projected that those numbers would rise to 61 percent, 27 percent, and 36 percent, respectively, by the beginning of the 2012 school year. Under *364 Option 2f, the Board projected that the percentage of at-risk students at East Ascension would decrease slightly for the first year that the redistricting was in effect and rise more slowly than without redistricting. By the 2012 school year, East Ascension was projected to have 57 percent at-risk students under Option 2f, Dutchtown was projected to have 26 percent, and St. Amant was projected to have 36 percent. In addition, the proportion of minority students at East Ascension was projected to be lower under Option 2f than without any redistricting — 47 percent by 2012 under Option 2f compared to 51 percent under the then-current plan.
After examining these statistics and the rest of the record, I am frankly perplexed at Lewis’s contention that Option 2f disproportionately impacted East Ascension. It is true that East Ascension received more at-risk students under Option 2f, but East Ascension was going to receive more students under any redistricting plan. The undisputed evidence suggests that East Ascension was under-enrolled at the time of the redistricting and was the high school in the best position to relieve the overcrowding in the Dutchtown feeder system. Thus, additional students were going to attend East Ascension regardless of whether those students were “at risk,” minority, or non-minority students. And under Option 2f, the proportion of at-risk students with respect to the entire student population actually decreased compared to the projected at-risk enrollment had the Board taken no redistricting action.
Even if Lewis could demonstrate that the assignment of at-risk students to East Ascension under Option 2f had a disproportionate impact, he has not demonstrated that the Board acted with a discriminatory purpose. Lewis makes little effort to demonstrate discriminatory intent under any of the Village of Arlington Heights factors. Instead, he simply argues that the Board must have acted with a discriminatory intent because it was aware of the racial demographics when it assigned additional at-risk students to attend East Ascension. But discriminatory intent “implies more than intent as volition or intent as awareness of consequences.” Feeney, 442 U.S. at 279, 99 S.Ct. 2282. “It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part ‘because of,’ not merely ‘in spite of,’ its adverse effects upon an identifiable group.” Id. Lewis must therefore demonstrate that the Board adopted Option 2f because of its disproportionate impact, not merely that the Board was aware of its impact.
Lewis argues that the addition of two “Title I”[7] elementary schools to the East Ascension feeder system is evidence of discriminatory intent because the Board did not add the schools to the Dutchtown or St. Amant feeder systems. The two schools to which Lewis refers are Duplessis Elementary and Pecan Grove Elementary. Pecan Grove is a new school, and the record contains no evidence that the at-risk students who will attend Pecan Grove did not previously attend another East Ascension elementary school. However, it is undisputed that Duplessis was transferred from Dutchtown to East Ascension under Option 2f. Lewis presented evidence that the Board considered at least one redistricting option under which Duplessis would remain assigned to Dutch-town and Prairieville, a new elementary school that was not projected to be a Title I school, would be assigned to East Ascension instead of Dutchtown. The record suggests that the Board was well aware *365 that the Duplessis option would cause a high number of at-risk children to be assigned to East Ascension and that at least one Board member expressed concern about the transfer.
While the record indicates that the Board members were aware of the impact that the Duplessis option, which became Option 2f, would have on the students at East Ascension, there is no evidence that the Board chose the Duplessis option because of its effect on the East Ascension minorities. Lewis does not argue that the Board’s decision to assign Duplessis to East Ascension was so abnormal that racial discrimination must have been a motivating factor. The District map indicates that the Duplessis attendance zone is geographically contiguous with the larger East Ascension attendance zone, and none of the attendance zones is so oddly shaped that it facially indicates any inappropriate gerrymandering. In fact, Lewis does not even argue that the Board ought to have adopted the Prairieville option over the Duplessis option, or that the Board had any other choice than the Duplessis option that would have solved the overcrowding issue at all of the schools. In essence, it appears that Lewis would like the Board to redraw all of the attendance zones in the entire District to balance the at-risk children among the three high schools, which would be contrary to the Board’s undisputed goal of reassigning no more students than absolutely necessary. Lewis has not created a genuine issue of fact for trial regarding the Board’s motive because he utterly failed to connect the Board’s awareness of the racial demographics at East Ascension with the Board’s decision to assign additional at-risk students to East Ascension.
The majority makes much of the evidence that Lewis presented that suggests the Board was aware of the race of individual students when it re-zoned the schools. Specifically, the majority focuses on the deposition testimony of several Board members that they had a desire to maintain unitary status and to preclude increasing the percentage of minority students at East Ascension. The majority also points to a statement on the Board’s web site that the Board was “simply trying to balance the demograph[ics] of East Ascension.” However, this evidence does not even speak to whether the Board acted with an intent to discriminate through the disproportionate placement of at-risk students in schools attended predominantly by minorities. Thus, this evidence is insufficient to raise questions about the level of scrutiny that applies.

B. Lewis’s Claim Fails Under Rational Basis Review

We need not apply strict scrutiny because Lewis presented insufficient evidence that the Board acted with discriminatory purpose or had a discriminatory motive when it assigned at-risk students to the East Ascension feeder system. Accordingly, we should examine the Board’s decision to determine whether the Board had a rational basis for assigning the students to East Ascension. See Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Under rational basis review, “a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification,” and the burden is on the challenger to “negative every conceivable basis which might support [the classification].” Heller v. Doe, 509 U.S. 312, 320-21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citations and internal quotation marks omitted).
Lewis has presented no evidence or argument that the Board did not have a *366 rational basis for assigning at-risk students to attend East Ascension. Indeed, my review of the record indicates that Option 2f may have in fact been the most practical option. The “Prairieville Option” and “Option 3” are the only plans considered by the Board that would have resulted in a lower percentage of at-risk students assigned to East Ascension. Evidence in the record indicates that under the “Prairieville Option,” the percentage of at-risk students in East Ascension was projected to be 46 percent by 2012, 11 percent lower than the projection under Option 2f. But under this option, the enrollment at East Ascension would increase from approximately 1,200 students to over 2,000 students, far more students than either of the other two high schools. Under Option 3, the at-risk percentage would be 55 percent by 2012, just two percent lower than the projected at-risk percentage under Option 2f. And according to the enrollment projections for Option 3, Dutchtown would still have far more students than East Ascension, which would not alleviate the overcrowding issue at Dutchtown.
Because Lewis has not met his burden to prove that the Board had no rational basis to assign additional at-risk students to East Ascension, I would affirm the district court’s grant of summary judgment in favor of the Board.

III. Awareness of Consequences, Option 2f, and Parents Involved

The majority criticizes the “assumption that it might be justifiable to use racially-based decisions for the ‘benign’ purpose of maintaining post-unitary ‘racial balance’ among the schools in the system” as being “at least in tension with the Supreme Court’s decision in Parents Involved.” Maj. Op. at 349. The majority’s attempt to relate the instant case to Parents Involved is troubling for several reasons. Critically, any claims Lewis may have had related to assigning students to schools based on race are not before us. Thus, the notion of racial balancing need not, and should not, enter into our analysis.
Further, the holding in Parents Involved pertained only to plans that expressly use race to determine which school a student will attend and thus does not speak to the matter before us. The plurality opinion makes clear that the plans in Parents Involved used “explicit racial classifications” and that “other means for achieving greater racial diversity in schools ... implicate different considerations.” See 551 U.S. at 745, 127 S.Ct. 2738; cf. Equity in Athletics, Inc. v. Dep’t of Educ., 639 F.3d 91, 104 (4th Cir.2011) (stating that Parents Involved pertained to strict scrutiny analysis of race-based school assignments and “has little bearing” on a case subject to a lesser degree of scrutiny). In Parents Involved,
school districts ... adopted student assignment plans that rely upon race to determine which public schools certain children may attend. The Seattle school district classifies children as white or nonwhite; the Jefferson County school district as black or “other.” In Seattle, this racial classification is used to allocate slots in oversubscribed high schools. In Jefferson County, it is used to make certain elementary school assignments and to rule on transfer requests. In each case, the school district relies upon an individual student’s race in assigning that student to a particular school, so that the racial balance at the school falls within a predetermined range based on the racial composition of the school district as a whole. Parents of students denied assignment to particular schools under these plans solely because of their race brought suit, contending that allocating children to differ *367 ent public schools on the basis of race violated the Fourteenth Amendment guarantee of equal protection.
551 U.S. at 709-11, 127 S.Ct. 2738. Thus, the plans in Parents Involved used race as a deciding factor in determining which school a student would attend, whereas Option 2f is facially race neutral and bases the determination of where children will attend school on where they live, not on their race. This is not a Parents Involved case.
Moreover, the Court in Parents Involved did not, as the majority suggests, broadly hold that “preserving the district’s unitary status by means of racially-based assignments, albeit a ‘benign’ racial motive, was nevertheless constitutionally impermissible.” See Maj. Op. at 349. The holding in Parents Involved is far narrower than the majority’s description indicates. The plans at issue in Parents Involved were deemed unconstitutional because they were not sufficiently narrowly tailored to withstand strict scrutiny. See Parents Involved, 551 U.S. at 735, 127 S.Ct. 2738; id. at 786-87, 127 S.Ct. 2738 (Kennedy, J., concurring). The Court faulted the plans for their broad-brush, binary concept of race, as well as the failure to give “serious, good faith consideration of workable race-neutral alternatives,” as narrow tailoring requires. See id. at 735, 127 S.Ct. 2738 (internal quotation marks and citation omitted); see also Fisher v. Univ. of Tex. at Austin, 631 F.3d 213, 246 (5th Cir.2011) (“Parents Involved was primarily a critique of the school districts’ extreme approach that used binary racial categories to classify schoolchildren.” (internal quotation marks and citation omitted)).
Justice Kennedy, who provided the fifth vote in the five-to-four Parents Involved decision, specifically disagreed with the “all-too-unyielding insistence that race cannot be a factor in instances when ... it may be taken into account.” Parents Involved, 551 U.S. at 787, 127 S.Ct. 2738 (Kennedy, J., concurring). According to Justice Kennedy:
In the administration of public schools by the state and local authorities it is permissible to consider the racial makeup of schools and to adopt general policies to encourage a diverse student body, one aspect of which is its racial composition. If school authorities are concerned that the student-body compositions of certain schools interfere with the objective of offering an equal educational opportunity to all of their students, they are free to devise race-conscious measures to address the problem in a general way and without treating each student in different fashion solely on the basis of a systematic, individual typing by race.
Id. at 788-89, 127 S.Ct. 2738 (Kennedy, J., concurring) (citation omitted); see also Fisher, 631 F.3d at 246 (“The Court [in Parents Involved] did not hold that a Grutter-like system would be impermissible even after race-neutral alternatives have been exhausted .... To the contrary, Justice Kennedy ... wrote separately to clarify that a more nuanced, individual evaluation .... informed by Grutter would be permissible .... ” (internal quotation marks and citation omitted)); Hart v. Cmty. Sch. Bd. of Brooklyn, 536 F.Supp.2d 274, 282 (E.D.N.Y.2008) (“The deciding opinion of Justice Kennedy [in Parents Involved] ... allows for the use of race as one admission factor among others.”). In addition, Justice Breyer’s dissent, in which Justices Stevens, Souter, and Ginsburg joined, indicates the facially race-conscious plans at issue both served the compelling interest of “promoting or preserving greater racial ‘integration’ of public schools” and were narrowly tailored *368 to achieve that end. See Parents Involved, 551 U.S. at 887-38, 127 S.Ct. 2738 (Breyer, J., dissenting). Thus, at least five justices in Parents Involved endorsed the view that promoting diversity in elementary and secondary schools may be a compelling governmental interest. Consequently, it is clear that the Court in Parents Involved did not broadly condemn all student assignment plans that facially account for race, let alone prohibit all decisionmaking that merely takes place in light of some awareness of racial impact.
As I discussed above, the majority appears to suggest that Option 2f does classify students by race, thereby presumably bringing it closer to the ambit of Parents Involved. Importing the background analysis of the expected impact of the plan into the plan itself, however, is wholly inappropriate.[8] The fact remains that — unlike the plans in Parents Involved — Option 2f does not provide any mechanism to assign a student to a particular school based on that student’s race. That individual students may have been classified for the purpose of assessing the effect of student assignment plans on demographics is something very different from actually assigning individual students to particular schools on the basis of their race. The majority’s attempt to define Option 2f in a manner divorced from what it actually says and does has potentially far-reaching consequences and moves toward an inappropriately high level of scrutiny whenever there is some consideration — or perhaps merely awareness- — of the effects actions have on racial composition. However, as Justice Kennedy notes:
School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. Executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races. Assigning to each student a personal designation according to a crude system of individual racial classifications is quite a different matter; and the legal analysis changes accordingly.
Parents Involved, 551 U.S. at 789, 127 S.Ct. 2738 (Kennedy, J., concurring) (emphasis added) (internal quotation marks and citations omitted).
By blurring the line between awareness of the consequences of Option 2f and how *369 Option 2f actually assigns students to schools, the majority opinion seems to be taking a step toward requiring that strict scrutiny apply to any action in which effects on race were known or considered. Such a push toward strict scrutiny, however, is contrary to the law. See Hunt, 526 U.S. at 546, 119 S.Ct. 1545 (“A facially neutral law ... warrants strict scrutiny only if it can be proved that the law was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race.” (internal quotation marks and citations omitted)); Feeney, 442 U.S. at 279, 99 S.Ct. 2282 (“Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.” (footnote, internal quotation marks, and citation omitted)); see also Parents Involved, 551 U.S. at 789, 127 S.Ct. 2738 (Kennedy, J., concurring); Friends of Lake View Sch. Dist. Inc. No. 25 v. Beebe, 578 F.3d 753, 761-63 (8th Cir.2009) (applying a rational basis analysis to uphold a facially race-neutral law despite an alleged awareness of the act’s disproportionate impact on minorities). Consequently, I disagree with both the reliance on Parents Involved, as well as the suggestion that Option 2f classifies students by race.
The district court properly concluded that Lewis’s claim — that the Board engaged in unconstitutional discrimination when it re-assigned additional at-risk students to East Ascension and its feeder schools — is assessed under a rational basis analysis. Because Lewis has not demonstrated that the Board acted irrationally by adopting Option 2f, I would affirm the district court’s judgment in favor of the Board.

. I agree with the majority's handling of the issue regarding Lewis's capacity to sue on behalf of Child A. I also agree that Lewis's claims related to the redistricting that occurred in 2002 are barred by the statute of limitations.

. Lewis’s complaint alleged that "[the Board's] actions ... were taken to ensure that [East Ascension] would become predominantly African American, leaving the remaining two (2) east bank high schools as predominantly white" and that "race was a factor in [the Board's] adoption of Option 2f."

. Lewis alleged that the Board "was aware that the disproportionately large numbers of economically disadvantaged/'at risk' students being allocated to East Ascension High School, and the even larger economically disadvantaged/'at risk' populations at the feeder schools within the East Ascension High School feeder system would ensure that the non-while minority students at East Ascension High School would not, now and in the future, be afforded educational opportunities equal to those available to the students at either Dutchtown High School or St. Amant High School.”

. "The Plaintiff contends that the vastly disproportionate number of minorities assigned to attend EAHS is the 'suspect class' which is being treated unequally. The cause of this unequal treatment is the placing of an even higher proportion of 'at risk' students into the EAHS school system through the adoption and enactment of Option 2f .... ” Appellant's Br. at 30-31.

.Lewis’s counsel made the following statements during oral argument: (l)“What we're saying ... is that when you take an abnormal number of ‘at risk’ students and congregate them into a school situation, it has an adverse impact on the other students in that school”; (2) "We say that what's unjust is to congregate the mass of this challenge [the ‘at risk’ students] into the feeder system and school system that also contains a majority of the minority students”; and (3)"We feel that loading up or putting an abnormal number of ‘at risk’ students into the same school and school system where the minorities are is a breach of their civil rights.”
When asked, Lewis's counsel agreed his claim is that "this plan that’s been adopted here takes the 'at risk' students and puts them in the EA feeder pattern and thereby disadvantages minority students.” He also agreed that "[t]he aggrieved parties are] the minority students, and they are aggrieved because [the Board] put the 'at risk’ students with them in a way that disadvantages minority students.”

. The record contains two charts with demographic information regarding each plan. Because we must construe the evidence in the light most favorable to Lewis at this stage, I refer to the chart showing the greatest percentage of at-risk students. I also note that these percentages are slightly different from those referred to in the majority’s opinion. See Maj. Op. at 351 n. 14. The majority appears to analyze the demographic shift, or lack thereof, after the implementation of Option 2f. Because we are concerned with the Board's intent in adopting Option 2f, the more appropriate evidence on this point is the information the Board was actually presented with before it made its decision.

. A "Title I” school is a school that is eligible to receive additional federal funds due to the large proportion of low-income or "at risk” students.

. The Jones concurrence’s insistence that Option 2f is facially race conscious because the geographical categories it employs are proxies for race appears to be a similarly problematic attempt to bring this case within the reach of Parents Involved. See Jones Concurrence at 355 ("If the Ascension Parish Board used geographic lines as a proxy for racial balancing to 'maintain unitary status,’ the plan is explicitly race-based, and the Board's actions fly in the face of Parents Involved and require strict scrutiny review.”); Parents Involved, 551 U.S. at 745, 127 S.Ct. 2738 (plurality opinion) (describing Parents Involved as a case involving "explicit racial classifications”).